ACCEPTED
03-14-00698-CV
5573168
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/5/2015 10:24:41 PM
JEFFREY D. KYLE
CLERK

NO. 03-14-00698-CV

*IN THE*
*THIRD COURT OF APPEALS*
*AT AUSTIN, TEXAS*

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

6/5/2015 10:24:41 PM

JEFFREY D. KYLE
Clerk

## SHAMARK SMITH LIMITED PARTNERSHIP, ET AL.,
**Appellants,**
**v.**
## MARTIN M. LONGORIA,
**Appellee**

---

## APPELLEE'S BRIEF

---

JAMES DAVID WALKER
P. O. Box 41
Milano, Texas 76556
SBOT 20706000
Phone: (512) 636-9520
Fax:     (512) 455-7922
Email: walker@2appeal.com
ATTORNEY FOR
APPELLEE MARTIN M. LONGORIA

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Trial counsel W. W. Torrey enters an appearance as appellate co-counsel for Appellee Martin M. Longoria. Torrey now serves as the duly elected County and District Attorney for Milam County, Texas. This case is a holdover from his private practice.

James D. Walker continues to serve as Appellee's lead appellate counsel.

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Appellants' Brief contains numerous complaints which are supported by neither
    argument nor authority and Appellants consequently have waived any error
    thereby raised. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I. EVIDENCE SUPPORTING DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . 15

        I-A. Theories of Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            Appellants' liability-theory complaints are not preserved.. . . 15
            The complaints lack merit. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        I-B. Defamation Damages Presumed. . . . . . . . . . . . . . . . . . . . . . . . 17
            Under Texas defamation law, Longoria's general damages
                (reputation damages and mental anguish damages) are
                presumed and need not be shown supported by evidence
                because: (1) Appellants' theft accusation was defamatory
                per se; and (2) in some instances the theft accusation
                constituted statutory libel.. . . . . . . . . . . . . . . . . . . . . . . 17
            The Texas Constitution restricts judicial power to change
                common law and statutory principles governing
                defamation. Texas courts must apply Texas defamation
                law if such application is not clearly prohibited by the
                federal constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
            Longoria's recovery of presumed defamation damages is not
                barred by the federal constitution. . . . . . . . . . . . . . . . . 22

I-C. Any Review of Damages Should Be Limited. . . . . . . . . . . . . . . 26
> If a review of  general damages is required, then such a review should  be limited to the issues of whether damages are either excessive or the product of improper influences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I-D. Reputation Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
> Although Longoria's reputation damages are presumed and need not be shown supported by evidence, Longoria's reputation damages are nevertheless supported by evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

I-E. Mental Anguish Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
> Although Longoria's mental anguish damages are presumed and need not be shown supported by evidence, Longoria's mental anguish damages are nevertheless supported by evidence... . . . . . . . . . . . . . . . . . . . . . . . 37

I-F. Exemplary Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
> Because Appellants' only complaint about exemplary damages is that they cannot be recovered without an award of actual damages, it follows that Longoria should recover the exemplary damages awarded if he recovers any amount of actual damages. . . . . . . . . . . . . . . . . . . . . . . 46

II. EVIDENCE SUPPORTING ATTORNEY'S FEES. . . . . . . . . . . . . . . . 47

Longoria recovered damages, but his attorney's fee award is not dependent on a recovery of damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

> Longoria is entitled to attorney's fees and costs under the Uniform Declaratory Judgments Act, which authorizes "the court" to award attorney's fees that are equitable and just. . . . . . . . . . . 47

> Additionally and alternatively, Longoria is entitled to attorney's fees and costs under CPRC Chapter 134, the Texas Theft Liability Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

iii

Longoria's attorney's fee award is supported by evidence........ 51

Any failure to apportion attorney's fees does not require reversal. . 55

Any failure to condition appellate attorney's fees on success does not
    require reversal.................................................. 58

III. CHALLENGE FOR CAUSE. ................................. 59

III-A. Complaint Not Preserved. ............................ 59
    Appellants failed to preserve complaint about the trial court's
        ruling on their challenge for cause.. ................ 59
        Appellants failed to identify (either by name or number)
            specific objectionable veniremembers that would
            remain on the jury list. .................... 60
        If Appellants are deemed to have identified specific
            objectionable veniremembers, it was not shown to
            have been timely done. .................... 61
        Appellants failed to exhaust their peremptory challenges
            on veniremembers who were challenged for cause
            ...................................... 62
        Appellants secured an undue advantage by using one of
            their peremptory challenges on a Hispanic-
            surnamed veniremember who was not challenged
            for cause. ................................ 64

III-B. No Abuse Of Discretion. ............................ 66
        Even if complaint had been preserved, the court did not abuse
            its discretion by overruling Appellants' challenge for
            cause........................................ 66
        The error assigned in this Court differs from the
            complaint made at trial. ................... 66
        In any event, the challenged veniremembers did not
            exhibit a bias. .......................... 67
        The challenged veniremembers exhibited (at worst)
            confusion, misunderstanding, and ignorance of the
            law. ..................................... 67

iv

Any confusion was dispelled (rehabilitated) by
Longoria's counsel and the trial court. . . . . . . . . 70

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

CERTIFICATE OF WORD COUNT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
    1. Longoria's Affidavit
    2. Longoria's Voluntary Statement Given to Deputy Ivy
    3. Marcus' Handwritten Statement
    4. Marcus' Typed Statement
    5. List of Property Values Submitted to Sheriff
    6. Deputy Ivy's Investigative Report
    7. Deputy Ivy's Probable Cause Affidavit
    8. Smith's Grand Jury Submission (Direct File)
    9. Grand Jury No Bill
    10. Smith's Sworn Proof of Loss Submitted to Insurance Company
    11. Notice of Insurance Claim Reported 3/3/2008
    12. Insurance Claim Red Flagged
    13. Insurance Claim Paid
    14. Jury Charge

# INDEX OF AUTHORITIES

## *Cases*

*Air Routing Int'l Corp. v. Britannia Airways, Ltd.*, 150 S.W.3d 682
(Tex.App.–Hou. [14th Dist.] 2004, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Arrow Marble, LLC v. Killion*, 441 S.W.3d 702 (Tex.App.–Hou. [1st Dist.] 2014,
no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997). . . . 52

*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002).. . . . . . . . . . . . . . . . . . . . . . . 22-24

*Britton v. Tex. Dep't of Crim. Justice*, 95 S.W.3d 676 (Tex.App.–Hou. [1st Dist.]
2002, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Burbage v. Burbage*, 447 S.W.3d 249 (Tex. 2014). . . . . . . . . . . . . . . 24, 25, 35-37

*Capps v. Nexion Health at Southwood Inc.,* 349 S.W.3d 849 (Tex.App.–Tyler
2011, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Carey v. Piphus*, 435 U.S. 247 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). . . . . . . . . . . . . . . . . . 33, 41

*City of San Antonio v. Heim*, 932 S.W.2d 287 (Tex.App.–Austin 1996, pet. den.)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Cortez ex rel. Estate of Puentes v. HCCI-San Antonio, Inc.,* 159 S.W.3d 87 (Tex.
2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 61, 62, 67, 70

*Daniels v. Empty Eye, Inc.,* 368 S.W.3d 743 (Tex.App.–Hou. [14th Dist.] 2012, pet
den.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Downing v. Burns*, 348 S.W.3d 415 (Tex.App.–Hou. [14th Dist.] 2011, no pet.)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ford v. Premier Installation & Design Group, Inc.*, 2013 WL 4680513 (Tex.App.–Hou. [14th Dist.] 2013, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Gertz v. Robert Welch*, 418 U.S. 323 (U.S. 1974). . . . . . . . . . . . . . . . . . . . . . . . 22

*Guillaume v. City of Greenville*, 247 S.W.3d 457 (Tex.App.–Dallas 2008, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Guisti v. Galveston Tribune*, 105 Tex. 497 (Tex. 1912). . . . . . . . . . . . . . . . . . . . 19

*Hallett v. Houston Northwest Medical Center*, 689 S.W.2d 888 (Tex. 1985). . . 59, 61, 65

*Hancock v. Variyam*, 400 S.W.3d 59 (Tex. 2013). . . . . . . 18, 22, 24-26, 32, 34, 35

*Holland v. Wal-Mart Stores*, 1 S.W.3d 91 (Tex. 1999). . . . . . . . . . . . . . . . . . . . . 47

*In re Corral-Lerma*, 451 S.W.3d 385 (Tex. 2014). . . . . . . . . . . . . . . . . . . . . . . . 49

*In re Lipsky*, 2015 Tex. LEXIS 350 (Tex. 2015). . . . . . . . . . . . . . . . . 19, 30, 36, 71

*In re Reese*, 402 B.R. 43 (Bankr. M.D. Fla. 2008). . . . . . . . . . . . . . . . . . . . . . . . 34

*Knoll v. Neblett*, 966 S.W.2d 622 (Tex.App.–Hou. [14th Dist.] 1998, pet. den.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Larson v. Cactus Utility Co.,* 730 S.W.2d 640 (Tex. 1987). . . . . . . . . . . . . . . . . . 28

*Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369 (Tex. 1984). . . . . . 20

*Matthews v. Candlewood Builders, Inc.,* 685 S.W.2d 649 (Tex. 1985). . . . . . . . . 56

*McCluskey v. Randall's Food Mkts., Inc.*, 2004 WL 2340278 (Tex.App.–Hou. [14[th] Dist.] 2004, pet. den.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*McCullough v. Scarbrough, Medlin & Assocs.*, 435 S.W.3d 871 (Tex.App.–Dallas 2014, pet. den.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McGregor v. Vela*, 2002 WL 220072 (Tex.App.–Austin 2002, no pet.). . . . . . . . 33

*McMillin v. State Farm Lloyds*, 180 S.W.3d 183 (Tex.App.–Austin 2005, pet. den.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Medical v. Wikle*, 2013 WL 2390103 (Tex.App.–Amarillo 2013, no pet.). . . . . . 36

*Miranda v. Byles*, 390 S.W.3d 543 (Tex.App.–Hou. [1st Dist.] 2012, pet. den.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 56

*Moore v. Lillebo*, 722 S.W.2d 683 (Tex. 1986). . . . . . . . . . . . . . . . . . . . . . . . 39

*Murff v. Pass*, 249 S.W.3d 407 (Tex. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 73

*Northeast Texas Motor Lines, Inc. v. Hodges*, 158 S.W.2d 487 (Tex. 1942). . . . 73

*Parkway Co. v. Woodruff*, 901 S.W.2d 434 (Tex. 1995). . . . . . . . . . . 38, 40, 42, 44

*R & R Res. Corp. v. Echelon Oil & Gas*, 2011 Tex. App. LEXIS 295 (Tex.App.–Austin 2011, pet. den.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Rogers v. City of Fort Worth*, 89 S.W.3d 265 (Tex.App.–Fort Worth 2002, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*SEC v. Singer*, 786 F. Supp. 1158 (S.D.N.Y. 1992). . . . . . . . . . . . . . . . . . . . 34

*Simon & Schuster v. Dove Audio*, 970 F. Supp. 279 (S.D.N.Y. 1997). . . . . . . . . 33

*Smirl v. Globe Laboratories*, Inc., 188 S.W.2d 676 (Tex. 1945). . . . . . . . . . . . . 65

*Smith v. Dean*, 232 S.W.3d 181 (Tex.App.–Fort Worth 2007, pet. den.). . . . 68, 73

*South Tex. Freightliner, Inc. v. Muniz*, 288 S.W.3d 123 (Tex. App. Corpus Christi 2009, pet. den.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Southwest Grain Co. v. Garza*, 2007 WL 1087179 (Tex.App.–Corpus Christi 2007, pet. den.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Southwestern Tel. & Tel. Co. v. Long*, 183 S.W. 421 (Tex.Civ.App.–Austin 1915, no writ).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 40

*Strong v. Nicholson*, 580 So. 2d 1288 (Miss. 1991).. . . . . . . . . . . . . . . . . . . . . 45

*Texas Farm Bureau Ins. Cos. v. Sears*, 54 S.W.3d 361 (Tex.App.–Waco 2001), *rev'd*, 84 S.W.3d 604 (Tex. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Thrift v. Hubbard*, 974 S.W.2d 70 (Tex.App.–San Antonio 1998, pet. den.). . . . 28

*Tom Benson Chevrolet, Inc. v. Alvarado*, 636 S.W.2d 815 (Tex.App.–San Antonio 1982, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006). . . . . . . . . . . 57

*Tony Houseman Assocs. v. Couch*, 1996 WL 125529 (Tex.App.–Beaumont 1996, no writ).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Tranum v. Broadway*, 283 S.W.3d 403 (Tex.App.–Waco 2008, pet. den.). . 16, 18, 27, 28

*Turner v. KTRK TV, Inc.*, 38 S.W.3d 103 (Tex. 2000). . . . . . . . . . . . . . . . . 21, 24

*Union Pac. R.R. v. Legg*, 2009 WL 2476636 (Tex.App.–Austin 2009, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Valley Nissan, Inc. v. Davila*, 133 S.W.3d 702 (Tex.App.–Corpus Christi 2003, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Waste Management of Texas, Inc. v. Texas Disposal System Landfill, Inc.*, 434 S.W.3d 142 (Tex. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 35, 36, 39

*Williams v. Skelton*, 2007 WL 899907 (Tex.App.–Waco 2007, pet. den.).. . . . . . 64

*Williamson v. New Times, Inc.*, 980 S.W.2d 706 (Tex.App.–Fort Worth 1998, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Wyler Indus. Works v. Garcia*, 999 S.W.2d 494 (Tex.App.–El Paso 1999, no pet.)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Zeliff v. Jennings*, 61 Tex. 458 (Tex. 1884). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Constitution, Statutes, and Rules*

Texas Civil Practice And Remedies Code § 134.003. . . . . . . . . . . . . . . . . . . . . . . . 48

Texas Civil Practice And Remedies Code § 134.005. . . . . . . . . . . . . . . . . . . . . . . . 48

Texas Civil Practice And Remedies Code § 37.009. . . . . . . . . . . . . . . . . . . . . . . . 47

Texas Civil Practice And Remedies Code § 73.001. . . . . . . . . . . . . . . . . . . . . 19, 20

Texas Penal Code § 31.03. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Texas Rules of Appellate Procedure, Rule 33.1. . . . . . . . . . . . . . . . . . 15, 56, 58, 73

Texas Rules of Appellate Procedure, Rule 38.1. . . . . . . . . . . . . . . . . . . . . . . . . . 14

Texas Rules of Civil Procedure, Rule 274. . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 56

Texas Rules of Civil Procedure, Rule 286. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## STATEMENT OF THE CASE

Appellants' statement of the case fails to note that Appellants also sought relief under the Uniform Declaratory Judgments Act and the Texas Theft Liability Act.

## STATEMENT OF FACTS

Appellee Martin M. Longoria owns and operates a business which has employed as many as sixteen people.[1] He owns harvesting equipment plus substantial real property in Mexico.[2] He has negotiated many contracts.[3] He pays taxes and supports a family.[4]

Longoria was born in Mexico but has been in the United States on a permanent visa for 34 years.[5] He employs both U.S. and Mexican citizens.[6] His foreign employees are brought to the U.S. through work visas.[7]

Longoria has succeeded despite many challenges. He has a third grade education.[8] He cannot read the English language.[9] He has difficulty understanding the nuances of certain English language words.[10]

---

[1](RR8:225,228,260)

[2](RR6:173; RR8:215)

[3](RR8:218)

[4](RR8:278)

[5](RR8:259-260,277; Appendix2 / PlExh8B-2,p.4)

[6](RR8:222)

[7](RR8:224,260)

[8](Appendix2 / PlExh8B-2,p.5)

[9] (Appendix2 / PlExh8B-2,p.5)

[10](RR8:237-242; RR9:17-18)

Longoria had for at least six years had provided contract labor (ranch work) for Appellant Paul Smith (a criminal-defense attorney) and Appellant Sharon Marcus (then Smith's wife).[11] Smith and Marcus then made Longoria the fall guy in a scheme to collect insurance proceeds.

The insurance scheme concerned the deconstruction of, and alleged theft of property from, a rural vacant farm house (herein the House).[12] The House was owned by Appellant Shamark Smith Limited Partnership.[13] Smith managed the Partnership but he allowed Marcus to make decisions and representations about the House.[14] Marcus was the limited partner and thus had the economic benefit.[15]

The tax appraisal district appraised the House as having no value.[16] A neighbor described the House as a "buzzard roost."[17]

Longoria and Smith discussed deconstructing the House.[18] Smith told

---

[11](7RR:145; 8RR:102,181; PlExh8B-2,p.6; Appendix1 / PlExh14A-15)

[12](5RR:13; RR6:130; RR7:45-46; Appendix6 / PlExh7A)

[13](DefExh7A; 7RR:92-93)

[14](RR6:267; RR7:56-62,67,91-94; RR8:244,278-279; Appendix3 / PlExh6B; Appendix8 / PlExh29,p.2)

[15](RR5:73)

[16](RR7:99-101)

[17](RR6:154,177-178)

[18](PlExh8B-2,p.8)

2

Longoria that he would need to discuss it with Marcus to see what she wants to do.[19]

About six months later, Marcus and Longoria discussed the House.[20] Longoria testified that Marcus said she might doze it down.[21] Longoria contends, but Appellants deny, that he and Marcus reached the following agreement: Longoria would deconstruct the House; Longoria would keep the roof tin; and, Marcus would keep the lumber.[22]

The evidence does not leave any room for a misunderstanding. For example, Longoria testified that only he and Marcus were present during the discussion.[23] In contrast, Smith and Marcus testified that they both were present – and insisted that they had declined Longoria's offer to deconstruct the house, telling Longoria that they planned to turn the House into a bed and breakfast.[24]

About three days after Marcus and Longoria made the agreement,

---

[19](RR8:244,278-279,299-300)

[20](PlExh8B-2,pp.8-9; Appendix1 / PlExh14A-15; RR8:244-245)

[21](RR8:245)

[22](Appendix2 / PlExh8B-2,pp.8-9; Appendix1 / PlExh14A-15; RR8:244-246)

[23](RR8:219,245)

[24](RR7:124-126,215-217)

3

Longoria's employees began deconstructing the House.[25] Per the agreement, they removed the tin and began storing it at Longoria's headquarters but left the lumber stacked in place.[26]

Over the course of about a week Longoria's employees made enough noise to be heard by several neighbors - hammering, crinkling, banging, beating, "tearing something down."[27] Smith and Marcus admitted to having heard the hammering.[28]

Smith conceded that Longoria knew where Smith and Marcus lived (just a few hundred yards across the road from the House) and, additionally, that Longoria knew Smith and Marcus drove by the House on a daily basis.[29] The House was on top of a hill and was visible from two county roads.[30]

On March 2, 2008, about a week after the work had commenced, Smith purported to "discover" the House's condition (being partially deconstructed).[31]

---

[25](RR8:188; Appendix2 / PlExh8B-2,pp.8-9)

[26](PlExh8B-2,pp.10-14)

[27](RR6:129-130,133-136,163,179-180)

[28](RR7:174-175,217-218)

[29](RR7:138,218; RR8:244-245; Appendix1 / PlExh14A-15,par.6)

[30](RR6:185-186; RR8:273-274)

[31](Appendix6 / PlExh7A; RR7:217–219)

4

Smith and Marcus called the sheriff and reported a burglary committed by persons unknown.[32] They complained that both personalty and building materials had been stolen.[33]

The next day, Smith notified his insurance company about the "theft."[34] Smith posted ads in seven different newspapers offering a reward for information related to the "theft."[35]

Thereafter, Marcus and a neighbor visited Longoria's headquarters and recognized the stored tin (decoratively painted) as having come from the House.[36] They passed Longoria on the way back but did not stop.[37] Although Smith was aware of this tin "discovery," and although the neighbor repeatedly encouraged Marcus to call Longoria, neither Marcus nor Smith contacted Longoria and likewise neither notified law enforcement about the tin "discovery."[38]

Some days after this "discovery" of the tin Marcus, on March 11, 2008,

---

[32](Appendix6 / PlExh7A)

[33](Appendix6 / PlExh7A)

[34](Appendix10 / DefExh1)

[35](DefExh5A-thru-5G; RR7:28,187)

[36](RR6:154,182,188-189; RR7:134,249-250; RR8:109-110)

[37](RR6:169-170,189-190; RR8:253-254)

[38](RR6:154,169-170,183,186-187,190; RR7:134,249-250; RR8:111)

5

purported to "discover" Longoria's employees drive to the House.[39] These employees are the same people who Longoria had sent to work on Marcus' property for the past six years.[40] Sheriff West and Deputy Ivy went to the scene after Marcus "called and stated that the suspects who had stolen the items from the farmhouse had returned."[41]

Marcus and Smith told Sheriff West that Longoria "did it."[42] Longoria arrived at the House to find his employees being detained with their hands in the air "like criminals."[43] This occurred in the presence of at least one of Marcus' neighbors.[44]

Longoria gave a voluntary statement and was released.[45] He confirmed that he had instructed his employees to deconstruct the house, admitted to taking the tin, and explained the agreement he had with Marcus.[46] He offered to take a lie

---

[39](Appendix6 / PlExh7A; Appendix4 / PlExh6A; RR7:249-250)

[40](RR8:181-182,242-243)

[41](Appendix6 / PlExh7A; Appendix4 / PlExh6A)

[42](RR6:208,226-227; RR8:255)

[43](RR8:252; Appendix6 / PlExh7A)

[44](Appendix6 / PlExh7A)

[45](Appendix2 / PlExh8B-2; Appendix6 / PlExh7A; RR8:198-99,256)

[46](PlExh8B-2; RR8:199,253,256-257; Appendix6 / PlExh7A)

6

detector test.[47]

Marcus and Smith told law enforcement that Longoria did not have permission to deconstruct the house.[48] Marcus also gave the sheriff two different written statements (the first handwritten and the second typed) wherein she denied having made the agreement with Longoria.[49] Appellants gave the sheriff a document which valued the property alleged to have been stolen.[50]

However, other than the tin, no property had been removed from the House.[51] Longoria testified: that he had walked through the House before his workers started;[52] that when he walked through the House with the sheriff on March 11th the building materials which had been deconstructed were still in the house - except for the tin stored on Longoria's property;[53] and, that the personalty which had been in the house when the job began was still there.[54] This was

---

[47](RR8:257-258; PlExh8B-2,p.14)

[48](RR8:255; Appendix6 / PlExh7A; Appendix7 / PlExh7B)

[49](Appendix4 / PlExh6A; Appendix3 / PlExh6B; Appendix6 / PlExh7A; RR6:267)

[50](Appendix6 / PlExh7A; Appendix5 / PlExh24; RR7:66-67)

[51](Appendix1 / PlExh14A-15,par.11)

[52](PlExh8B-2,pp.10-11; RR8:246-247)

[53](RR8:258,272)

[54](RR8:246; RR9:11-14; RR9:15)

7

confirmed by Marcus' neighbor, who testified that he had at first assumed there was a misunderstanding - because he had observed that only the tin was gone and he was aware that it was the tin that Longoria had requested in exchange for deconstructing the House.[55]

Relying on information provided by Appellants, the district attorney caused a warrant to be issued for Longoria's arrest.[56] In support of the warrant, Deputy Ivy filed a probable cause affidavit expressing a belief that Longoria had unlawfully appropriated property, in violation of Texas Penal Code § 31.03 (Theft - which provides that an appropriation of property is unlawful if it is without the owner's effective consent).[57] The affidavit reflects that Ivy's belief is based on the fact that Longoria admitted some of the property was stored in his yard and the fact that Smith and Marcus stated the property was removed from the House without permission.[58]

On March 25, 2008, Longoria turned himself in, was arrested, and posted bail.[59] Smith and Marcus told people in the community that Longoria had been

---

[55](RR6:154,183-184)

[56](Appendix6 / PlExh7A; Appendix7 / PlExh7B; RR6:224-227; RR7:74,107,185-187)

[57](Appendix7 / PlExh7B; RR7:185-187)

[58](Appendix7 / PlExh7B; RR8:255)

[59](Appendix6 / PlExh7A; RR7:107; RR8:202,262)

accused of theft and arrested.[60]

Smith gave his insurance company a sworn proof of claim which included the following statement: "Martin Longoria stole our property."[61] The values listed in the insurance claim far exceeded the $93,600 property theft reported to law enforcement.[62]

The insurance claim included $55,260 for personalty.[63] Significantly, although the insurance policy covered only Smith's and Marcus' property (and not the Partnership's), Smith also included a claim of $250,000 for the no-tax-value House (which belonged to the Partnership).[64]

The insurance company red-flagged the claim as being "suspicious," because it appeared that the materials alleged to be stolen were removed during a week time span during daylight hours, because neighbors reported hearing hammering, and because it looked like the house was being prepared for destruction.[65] Eventually the claim was processed but, because the bulk of the

---

[60](RR7:145-146; RR8:262,280)

[61](Appendix11 / PlExh25; 7RR:77)

[62](Appendix5 / PlExh24; Appendix11 / PlExh25; PlExh26)

[63](Appendix11 / PlExh25)

[64](Appendix11 / PlExh25; RR7:77,90-96,101-102;114-118)

[65](Appendix12/ DefExh1; RR7:85-90)

9

claim related to Partnership property not covered by the policy, the company paid only $27,810 of the $305,260 requested.[66]

Longoria's theory is that Smith and Marcus needed money but, in planning the insurance scheme, they simply failed to account for the fact that the Partnership House was not covered by their personal insurance policy.[67]

During the trial underlying this appeal, Smith testified that he understood, at the time he filed the claim, that the Partnership's property was not covered by the insurance policy.[68] He also testified that if the insurance company had sent a check for the $250,000 Partnership-property claim, he "would have probably wanted to cash it."[69]

At some point Smith submitted a report to the grand jury (a direct file), wherein he accused Longoria of theft.[70] On November 21, 2008, about eight months after Longoria was arrested, the grand jury issued a no bill.[71]

In the underlying civil proceeding Appellants complained that Longoria had

---

[66](RR7:29-31,95-96; Appendix13 / DefExh1; PlExh12)

[67](CR:338-339; RR5:40,57-66; RR8:261-262; RR9:173-175; Appendix10 / DefExh1)

[68](RR7:96)

[69](RR7:96)

[70](Appendix8 / PlExh29; RR7:73-75,110-111,148-150)

[71](Appendix6 / PlExh7A; Appendix9 / DefExh1)

10

committed conversion, trespass, and statutory theft (violation of the Texas Theft Liability Act).[72] Longoria counterclaimed, complaining of defamation, malicious prosecution, and intentional infliction of emotional harm.[73]

During the trial, Marcus called several people liars, including Smith.[74] Marcus testified that Sheriff West "did a lot of lying on the stand."[75] Ultimately, Marcus admitted that she herself had sworn to false statements under oath in at least two different documents.[76]

The jury unanimously failed to find that Longoria had committed conversion, trespass, and statutory theft.[77] The jury unanimously found for Longoria on defamation, malicious prosecution, and intentional infliction.[78]

Because Appellants challenge only the evidentiary support for damages and attorney's fees (not liability), this discussion has been limited to facts which put Longoria's damages in perspective. Additional facts and clarifications will be

---

[72](CR:8,116)

[73](CR:335)

[74](RR7:205,227; RR8:116-118,128,144-147)

[75](RR8:118)

[76](RR8:130-137)

[77](CR:1031)

[78](CR:1031)

11

discussed in context with the argument.

## SUMMARY OF ARGUMENT

Because Appellants' theft accusation was defamatory per se, and because in some instances it constituted statutory libel, Longoria's actual damages are presumed and need not be shown supported by evidence. Nevertheless, the damages are supported by evidence - as is Longoria's attorney's fee award.

Appellants failed to preserve any error in the trial court's ruling on their challenge for cause. In any event, the court did not abuse its discretion by overruling Appellants' challenge for cause.

## ARGUMENT

**Appellants' Brief contains numerous complaints which are supported by neither argument nor authority and Appellants consequently have waived any error thereby raised.** The failure to adequately brief an issue by failing to specifically argue and analyze one's position waives any error on appeal. *McCullough v. Scarbrough, Medlin & Assocs.*, 435 S.W.3d 871, 911-912 (Tex.App.–Dallas 2014, pet. den.); *see* TRAP 38.1(i) (brief must contain argument for contentions made, with citation to authorities). Longoria will try not to belabor this issue, but asks the Court to apply these principles where appropriate.

# I. EVIDENCE SUPPORTING DAMAGES

## *I-A. Theories of Liability*

Although Appellants do not challenge the evidentiary basis for liability, Appellants complain about the manner in which Jury Question 19 (damages) is linked to the liability theories. Appellants argue that Longoria thereby waived the right to recover damages under the jury's malicious prosecution finding (Question 12) and under the jury's intentional infliction finding (Question 13). Appellants also complain that the intentional infliction claim is a gap filler and further complain that, as such, it is not an available cause of action.

**Appellants' liability-theory complaints are not preserved.** Appellants have not demonstrated that the complaints were preserved. *See* TRAP 33.1 (preservation requires objection and ruling).

Significantly, Appellants did not object to the manner by which Question 19 (damages) is linked to liability theories. Thus, the liability-theory complaints are not preserved. *See* TRCP 274 (no objection may be adopted by reference); *Tom Benson Chevrolet, Inc. v. Alvarado*, 636 S.W.2d 815, 823 (Tex.App.–San Antonio 1982, writ ref'd n.r.e.) (party cannot complain that jury was permitted to find damages based upon an improper, a wrong or an immaterial instruction, where no complaint was made to the charge on this basis).

15

**The complaints lack merit**. At the very least, the jury's malicious prosecution finding and the jury's defamation finding each independently provide a liability basis for the jury's damages findings. Appellants rely on an unduly narrow construction of the jury's findings. The jury charge is attached (Appendix14).

In Question 19 the jury was asked to find damages caused by the Question 14 theft accusation (Appellants' published statement that Longoria had stolen). (CR1052) As pleaded, the theft accusation was an integral part of both Longoria's malicious prosecution claim and Longoria's defamation claim. *See e.g.* CR:337 (malicious prosecution - alleging that theft accusation resulted in a criminal investigation, criminal charges, and grand jury consideration) & CR:339 (defamation - alleging that theft accusation was defamatory). Indeed, Appellants concede that the theft accusation is an issue common to both malicious prosecution and defamation." (Brief,p.17 - theft accusation central to all claims)

The theft accusation caused Longoria's injury - not just the injury arising out of defamation but, additionally, the injury arising out of malicious prosecution. *See e.g. Tranum v. Broadway*, 283 S.W.3d 403, 422 (Tex.App.–Waco 2008, pet. den.) (in malicious prosecution action, claimant may recover damage to reputation resulting from accusation brought against claimant).

16

Thus, when the Question 14 theft accusation finding is considered with the Question 12 malicious prosecution finding (that Appellants initiated or procured the prosecution with malice and without probable cause), Question 14 supports damages for malicious prosecution. And, when the Question 14 theft accusation is considered with the Questions 15-18 defamation findings (defamatory, false, and with requisite knowledge), Question 14 supports damages for defamation.

Question 19 (damages) is conditioned to allow the jury to award damages - proximately caused by the Question 14 theft accusation - if the jury answers "yes" to either the Question 12 malicious prosecution finding or the Question 18 defamation finding. Each of these theories independently support damages.

*I-B. Defamation Damages Presumed*

**Under Texas defamation law, Longoria's general damages (reputation damages and mental anguish damages) are presumed and need not be shown supported by evidence because: (1) Appellants' theft accusation was defamatory per se; and (2) in some instances the theft accusation constituted statutory libel.**

In the context of defamation, there is a distinction between *general damages* (which can be presumed) and *special damages* (which cannot be presumed). Actual or compensatory damages compensate a plaintiff for the injury incurred

17

and include *general damages* (which are non-economic damages such as for loss of reputation or mental anguish) and *special damages* (which are economic damages such as for lost income). *Hancock v. Variyam*, 400 S.W.3d 59, 65 (Tex. 2013).

Historically, defamation per se has involved statements that are so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish. *Hancock*, 400 S.W.3d at 63-64. Historically, defamation per se claims allow the jury to presume the existence of general damages without proof of actual injury. *Id.* at 65. In contrast, special damages are never presumed. *See id.* at 66 (plaintiff must always prove special damages).

Thus, under Texas common law a defendant is liable to a plaintiff for statements that are defamatory per se even in the absence of any evidence of harm. *Miranda v. Byles*, 390 S.W.3d 543, 555-56 (Tex.App.–Hou. [1st Dist.] 2012, pet. den.); *see Tranum*, 283 S.W.3d at 422 (because statements were slanderous per se, plaintiff was not required to present independent proof of mental anguish). At a minimum, the plaintiff is entitled to a  nominal sum, but is not limited to that amount, and the jury may choose to award substantial damages. *Miranda*, 390 S.W.3d at 555-56.

The amount to award for the presumed harm to the plaintiff's reputation lies within the jury's discretion. *Downing v. Burns*, 348 S.W.3d 415, 425 (Tex.App.–Hou. [14th Dist.] 2011, no pet.). Even if the jury is not instructed that it can presume damages, on appeal general damages can be presumed to flow from defamation per se. *Id*. at 425-26.

Whether a statement qualifies as defamation per se is generally a question of law. *In re Lipsky*, 2015 Tex. LEXIS 350, at *32 (Tex. 2015). Here, Appellants' theft accusation (CR1047 - that Longoria had stolen) was defamatory per se. *See Downing*, 348 S.W.3d at 424 (statement that defendant stole is defamatory per se); *In re Lipsky*, 2015 Tex. LEXIS 350, at *32 (accusation of crime is example of defamation per se); *Zeliff v. Jennings*, 61 Tex. 458, 466-467 (Tex. 1884) (words imputing moral turpitude are actionable per se).

Libel (as contrasted with slander) has a statutory basis. The Texas libel statute defines libel. *See* CPRC § 73.001 (herein "statutory libel").

"[I]n the enactment of [the predecessor to Section 73.001] the purpose was not only to make definite what constitutes actionable libel in this State, but to materially modify the doctrine of the common law upon that subject." *Guisti v. Galveston Tribune*, 105 Tex. 497, 504 (Tex. 1912).

Construing the predecessor to Section 73.001 (Art. 5430), the Supreme

Court has held that "a person defamed by a writing libelous per se may recover by bringing an action at common law without proof of injury." *Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984).

In *Leyendecker*, the court reviewed Mrs. Wechter's mental anguish damages for evidentiary support–because the statements directed toward her were not libelous per se–and the court reversed her award for want of evidence. 683 S.W.2d at 374. However, the court concluded that the statements directed toward Mr. Wechter were libelous per se–and thus affirmed his award of mental anguish damages without reviewing the evidence. *Id*. Proof of damages was inferred from the libelous statement.

To the extent that Appellants' theft accusation was published through a writing it constituted statutory libel per se. *See* CPRC § 73.001 (defining libel), Jury Question 15 (definition of "defamatory," which incorporates statutory definition of libel), Jury Question 14 (recognizing that statement can be published through a writing). As was noted, the sheriff was given at least two written statements denying that Longoria had permission to deconstruct the House along with a list valuing the "stolen" property; the reward ads alleged theft; and, the grand jury submission and the sworn proof of insurance loss both contained allegations that Longoria committed theft. (Supra,pp.7-10)

**The Texas Constitution restricts judicial power to change common law and statutory principles governing defamation. Texas courts must apply Texas defamation law if such application is not clearly prohibited by the federal constitution.**

The Texas Supreme Court has recognized state constitutional restrictions on judicial power to alter common law and statutory principles governing defamation, as follows:

> Although we have recognized that the Texas Constitution's free speech guarantee is in some cases broader than the federal guarantee, we have also recognized that broader protection, if any, cannot come at the expense of a defamation claimant's right to redress. Unlike the United States Constitution, the Texas Constitution expressly guarantees the right to bring reputational torts. The Texas Constitution's free speech provision guarantees everyone the right to "speak, write or publish his opinions on any subject, *being responsible for abuse of that privilege*." TEX. CONST. art. I, § 8 (emphasis in original). Likewise, the Texas Constitution's open courts provision guarantees that "all courts shall be open, and every person for an injury done him, in his lands, goods, person *or reputation*, shall have remedy by due course of law." TEX. CONST. art. 1, § 13.

*Turner v. KTRK TV, Inc.*, 38 S.W.3d 103, 116-117 (Tex. 2000) (emphasis in original - authority omitted).

Unless the defamation principles previously outlined have been limited by federal constitutional law, Longoria's damages are presumed and he is entitled to recover his general damages without proof of injury - without an independent

21

evidentiary basis. *See Hancock*, 400 S.W.3d at 71 (recognizing need to reconcile federal and state constitutional rights of free speech and the Texas constitutional right to recover for reputational torts).

**Longoria's recovery of presumed defamation damages is not barred by the federal constitution.** Although the federal constitution limits a state's power to presume defamation damages, in *Hancock* the Texas Supreme Court identified the circumstances under which the federal constitution permits defamation damages to be presumed: "[T]he [U.S.] Constitution only allows juries to presume the existence of general damages in defamation per se cases where: (1) the speech is not public, or (2) the plaintiff proves actual malice." 400 S.W.3d at 65-66, *citing Gertz v. Robert Welch*, 418 U.S. 323 (U.S. 1974).

If these are the only federal constitutional limitations on a state's power to presume damages in defamation cases, then there is no federal constitutional bar to such a presumption in Longoria's case. Longoria's case does not involve public speech. Moreover, the jury found that Appellants' theft accusation was made with actual malice.

In the constitutional sense, "actual malice means knowledge of, or reckless disregard for, the falsity of a statement." *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002). Reckless disregard is satisfied by evidence that the defendant in fact

22

entertained serious doubts as to the truth of his publication or evidence that the defendant actually had a high degree of awareness of the probable falsity of his statements. *Id*.

By the answer to Jury Question 18 the jury found that Appellants made the theft accusation with actual malice: that Appellants made the theft accusation with knowledge that it was false or with a high degree of awareness that it was false, such that they had serious doubts as to its truth. (CR:1051) Thus, there being no federal constitutional bar to presumed damages, under Texas defamation law Longoria's general damages (mental anguish damages and reputation damages) are presumed and need not be shown supported by evidence.

Appellants argue that there must be an evidentiary review of the amount of Longoria's general damages. However, it is the federal constitution which as a general rule requires such a review. *See Bentley*, 94 S.W.3d at 605 (the First Amendment requires appellate review of amounts awarded for non-economic damages in defamation cases to ensure that any recovery only compensates the plaintiff for actual injuries and is not a disguised disapproval of the defendant).

As demonstrated, the federal constitution does not require a review of the amount of Longoria's general damages - because Longoria's case falls within the exception to the rule: the speech at issue is not public and, in any event, Longoria

proved actual malice. *See Hancock*, 400 S.W.3d at 65-66 (*Gertz* allows juries to presume existence of general damages where speech is not public or where plaintiff proves actual malice); *Bentley*, 94 S.W.3d at 608 (Baker, J., dissent) (*Gertz* requires a reviewing court to review damage awards, and limit a defamed plaintiff's damages to those reflecting "actual injury," only when the culpability standard is less than actual malice).

Appellants argue that only nominal damages can be presumed. In this regard, the *Burbage* court held as follows:

> Texas law presumes that defamatory per se statements cause reputational harm and entitle a plaintiff to general damages such as loss of reputation and mental anguish. But this presumption yields only nominal damages. Beyond nominal damages, we review presumed damages for evidentiary support.

*Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014) (authority omitted).

On the surface, this holding seems inconsistent with state law defamation principles previously outlined. Unless the holding is based on federal constitutional limitations, it conflicts with the Texas Constitution's express guarantee of the right to bring reputational torts and the Texas libel statute. *See Turner*, 38 S.W.3d at 116-117 (broader protection of speech cannot come at the expense of a defamation claimant's right to redress).

The *Burbage* court signaled that its holding is based on federal

24

constitutional limitations and, at the same time, recognized (but did not have occasion to apply) the malice exception to those limitations, as follows:

> [J]udicial review of jury discretion remains important to protect free speech. See id. We must ensure that noneconomic damages compensate for actual injuries and are not simply "a disguised disapproval of the defendant." *Id* .; *see also Gertz v. Robert Welch*, *Inc* ., 418 U.S. 323, 350, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) ("[T]he private defamation plaintiff who establishes liability *under a less demanding standard than [knowledge of falsity or reckless disregard for the truth]* may recover only such damages as are sufficient to compensate him for actual injury.").

*Burbage*, 447 S.W.3d at 259 (emphasis added).

The *Hancock* court likewise recognized (but did not have occasion to apply) the malice exception to federal constitutional limitations on presumed damages. In *Hancock*, the jury found that the defendant had acted with actual malice. 400 S.W.3d at 71. However, because the court found the statement at issue was not defamatory per se, the court conducted a review of the evidence supporting damages. *Id*. at 68.

But, the *Hancock* court made it clear that it would not have conducted an evidentiary review (made it clear that supporting evidence would not have been required) had the statement at issue been defamatory per se. For example, the court held: "*Because Hancock's statements were not defamatory per se*, loss of reputation may not be presumed, and there must be competent evidence to support

25

this award of reputation damages." 400 S.W.3d at 70 (emphasis added). Similarly, the court observed: *"For statements not so injurious as to constitute defamation per se*, the plaintiff may only recover the damages she proves the statements actually caused (as well as exemplary damages if applicable)." *Id*. at 71 (emphasis added).

Longoria's reputation and mental anguish damages are presumed. *Cf. Carey v. Piphus*, 435 U.S. 247, 262-263 (1978) (statements that are defamatory per se by their very nature are likely to cause mental and emotional distress, as well as injury to reputation, so there arguably is little reason to require proof of this kind of injury).

*I-C. Any Review of Damages Should Be Limited*

**If a review of general damages is required, then such a review should be limited to the issues of whether damages are either excessive or the product of improper influences**. Because injury is presumed from the nature of the defamatory statement, an award of presumed general damages should not be subjected to the evidentiary review applicable to an award of special damages (which are not presumed). Consider the following:

> Because Tranum's statements were slanderous per se, Broadway was not required to present "independent proof" of mental anguish,"as the slander itself gives rise to a presumption of these damages. *The amount of damages in a defamation case is peculiarly*

26

*within the province of the fact-finder, and an appellate court will not disturb the verdict or award unless it appears from the record to be excessive or the result of passion, prejudice, or other improper influences.*

\* \* \*

The record in this case does not indicate that the jury's award of past mental anguish damages in the amount of $ 250,000 is either excessive or the result of passion, prejudice, or other improper influence. The amount was within the jury's discretion and we will not substitute our judgment for that of the jury even if we might have reached a different result.

\* \* \*

As a result of Tranum's malicious prosecution, Broadway was charged with committing the crime of theft. The jury could reasonably conclude that his reputation was subsequently damaged and that $ 75,000 is a reasonable amount to compensate for this damage. *See Thrift*, 974 S.W.2d at 80-81 ($ 275,000 in reputation damages for malicious prosecution "reasonable in light of the gross social stigma attached to criminal charges that Hubbard will be burdened with both professionally and socially as long as the indictment remains on her record"). The evidence is legally and factually sufficient to support the jury's award of damages for injury to Broadway's reputation.

*Tranum*, 283 S.W.3d at 422 (emphasis added).

Appellants have provided neither argument nor authority to demonstrate that Longoria's general damages award is excessive. Although Appellants assert that there must be evidence to justify the amount awarded, their analysis is confined to the argument that there is no evidence of injury to reputation and mental anguish. However, as noted, injury is presumed.

In any event, Longoria's damages are not excessive. General damages do

not require certainty of actual monetized loss. *Waste Management of Texas, Inc. v. Texas Disposal System Landfill, Inc.*, 434 S.W.3d 142, 153 (Tex. 2014).

The *Tranum* court affirmed a $250,000 award of mental anguish damages. 283 S.W.3d at 422. Additionally, in *Thrift* the defendant was indicted, but the criminal case was subsequently dismissed, and the court affirmed an award of $275,000 reputation damages and $150,000 mental anguish damages. *See Thrift v. Hubbard*, 974 S.W.2d 70, 76, 81 (Tex.App.–San Antonio 1998, pet. den.).

If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict. *Larson v. Cactus Utility Co.,* 730 S.W.2d 640, 641 (Tex. 1987). However, Appellants neither requested nor proved a basis for remittitur.

*I-D. Reputation Damages*

**Although Longoria's reputation damages are presumed and need not be shown supported by evidence, Longoria's reputation damages are nevertheless supported by evidence.**

First, a clarification. Contrary to Appellants' assertion (Brief,p.6), Longoria did not say that he was not arrested. Although he testified that he turned himself in (RR8:202), he did so after being informed of the warrant for his arrest (Appendix6

28

/ PlExh7A). Longoria was arrested and posted bail.[79]

Indeed, Smith and Marcos *told people* in the community that Longoria had been arrested. (RR7:146; RR8:280) They should not now be heard to argue that Longoria was not arrested.

There is evidence of reputation injury. Appellants themselves introduced Longoria's affidavit, which provides: "I have suffered humiliation and damage to my reputation as to those who have learned of the criminal charges brought by [Appellants]. This damage has hurt my ability to access property and work for various farmers and ranchers." (Appendix1 / PlExh14A-15) This unchallenged affidavit alone constitutes some evidence of reputation injury.

Appellants argue that Longoria cannot identify anyone who has refused to hire him as a result of the theft accusation. They observe that nobody told him his reputation has been damaged.

However, life doesn't work that way. Common sense says that people are not motivated to tell a person: "Your reputation has tanked as a result of those theft accusations." Common sense says that people aren't going to tell someone, "I was thinking about hiring you but have decided not to because of those theft accusations." *Cf. Southwestern Tel. & Tel. Co. v. Long*, 183 S.W. 421, 428

---

[79](Appendix6 / PlExh7A; RR7:107; RR8:202,262)

(Tex.Civ.App.–Austin 1915, no writ) (any person with sufficient intelligence to be guilty of slander ought, in the light of common experience, to anticipate the repetition of such slander, and the injurious consequence thereof). Consequently, damage to reputation must to a great extent be proved circumstantially. *Cf. In re Lipsky*, 2015 Tex. LEXIS 350, at *14 (all evidentiary standards recognize the relevance of circumstantial evidence).

The evidence shows that Longoria lost business as a result of reputation injury. Marcus' neighbor, who had known Longoria for 20-25 years, testified that as of the time of the deconstruction Longoria had done a lot of work for Appellants "as well as surrounding folks for a long, long time."[80] The neighbor knew Longoria to be a "good worker." (RR6:191)

Longoria arrived at the House on March 11th to find his workers being detained with their hands in the air. (RR8:252-253; Appendix6 / PlExh7A) This occurred in the presence of at least one of Marcus' neighbors. (Appendix6 / PlExh7A)

Appellants accused Longoria of theft and as a result Longoria was arrested. (Supra pp.7-8) Smith also submitted a report to the grand jury and a claim to the

---

[80](RR6:154,168-169,183-184)

30

insurance company - accusing Longoria of theft.[81]

People who knew Longoria could connect him to Appellants' reward ads (which alleged a theft). For example, one person showed Longoria the ads and said, "Look what's going on over there, what they're trying to do." (RR8:241-242; RR9:18)

Smith and Marcus told people in the community that Longoria had been accused of theft and arrested.[82] Smith did not deny that Longoria, up to that point, had a "great reputation." (RR7:145-146)

Longoria testified that he became aware that other people were treating him differently. (RR8:262) Longoria further testified:

> Q. You claim to have lost jobs that were lined up as a result of your arrest, true?
> A. That's true. My -- my work went down significantly, yes.

(RR8:202)

> Q. Going back to your reputation, you can't identify anyone who says or who has told you that your reputation has been damaged in any way whatsoever, true?
> A. Nobody have to come and tell me, Mr. Garcia. I can feel it.
> Q. No one has told you that your reputation has been damaged, true?
> A. No, not -- no.

---

[81](Appendix11 / PlExh25; Appendix8 / PlExh29; RR7:73-75,110-111,148-150)

[82](RR7:145-146; RR8:280)

Q. Who has -- I'm going to page 96 [of Longoria's deposition]. Question: "Who says that your reputation has been damaged? Can you give us the name of someone that says your reputation has been damaged?" "I mean, if anybody would come and tell me, I would tell you, but ain't nobody going to come and tell me."
No one has told you, true?
A. It's -- this is what happened, no. But, you know, like -- like -- like I tell you, ain't nobody going to come and tell me this is what happened with me. That's why you don't get the work I've been getting.

(RR8:213-214)

Most significantly, when asked whether there could be other reasons, reasons other than the theft accusation and arrest, as to why people might not want to hire him, he answered: "Yes. The thing is, all of a sudden it's happened and never happened before so, you know." (RR8:202-204) Later, he clarified that he is not aware of any reason, other than the theft accusation and arrest, that he would not be hired. (RR8:202-205)

The inference that Longoria lost business as a result of reputation injury does not violate the equal inference rule. That rule provides that a jury may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another. *Hancock*, 400 S.W.3d at 70-71.

Here, the inference is supported by strong circumstantial evidence. Longoria had done business in the rural community for a long time, he was known to be a

32

good worker with a good reputation, the theft accusation and arrest was publicized within the community, and thereafter he suddenly lost jobs that had been lined up. Longoria lost business as a result of reputation injury. *See McGregor v. Vela*, 2002 WL 220072, *13-14 (Tex.App.–Austin 2002, no pet.) (though some evidence supports view that plaintiff's business losses were due to market conditions and not to damage to his reputation, the record contains legally and factually sufficient evidence to support the jury's award).

The timing of Longoria's business loss is significant. Longoria testified that the business loss happened all of a sudden - and that it had never happened before. (RR8:202-204) *See City of Keller v. Wilson*, 168 S.W.3d 802, 821 (Tex. 2005) (even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess - thus, in product liability cases jurors may find evidence of a defect from subsequent modifications, even if there were plenty of other reasons for the changes).

Within the realm of circumstantial evidence, timing is huge. *Cf. Guillaume v. City of Greenville*, 247 S.W.3d 457, 464 (Tex.App.–Dallas 2008, no pet.) (in whistleblower case, the timing of defendant's conduct in relation to plaintiff's speech can be circumstantial evidence of a retaliatory motive); *Simon &*

*Schuster v. Dove Audio*, 970 F. Supp. 279, 295 (S.D.N.Y. 1997) (the timing of defendant's publications in relation to plaintiffs' publications strongly supports an inference of deliberate plagiarism); *SEC v. Singer*, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992) (in context of insider trading claim, circumstantial evidence such as suspicious timing of trades is a factor relevant to proving that tipping activity has occurred); *In re Reese*, 402 B.R. 43, 51 (Bankr. M.D. Fla. 2008) (the timing of debtor's filing can evidence an intent to delay or frustrate the efforts of secured creditors to enforce their rights).

In *Hancock*, the timing factor was less clear. Moreover, the *Hancock* court was procedurally precluded from considering Variyam's demotion as evidence of reputation injury. 400 S.W.3d at 70.

Regarding Variyam's denial of accreditation for a fellowship, the *Hancock* court observed that Variyam offered no evidence that the inference regarding the defamatory letter was more probable than other possible inferences. *Id.* at 70-71. However, Variyam was not shown to have had any right to the accreditation. In contrast, Longoria "lost jobs that were lined up." (RR8:202)

Other cases cited by Appellants can be distinguished on the basis that Longoria (unlike plaintiffs in the other cases) sought only general (non-economic) damages and consequently was not required to present evidence of a specific

34

dollar loss. Actual or compensatory damages are intended to compensate a plaintiff for the injury incurred and include *general damages* (which are non-economic damages such as for loss of reputation or mental anguish) and *special damages* (which are economic damages such as for lost income). *Hancock*, 400 S.W.3d at 65.

Longoria sought and the jury found general / non-economic damages (reputation and mental anguish damages). (RR8:203; CR:1052-1053) These damages do not require certainty of actual monetized loss. In *Waste Management*, the Supreme Court observed:

> Non-pecuniary harm includes damages awarded for bodily harm or emotional distress. Similar to general damages, these non-pecuniary damages do not require certainty of actual monetized loss. Instead, they are measured by an amount that a reasonable person could possibly estimate as fair compensation. Conversely, damages for pecuniary harm do require proof of pecuniary loss for either harm to property, harm to earning capacity, or the creation of liabilities.

434 S.W.3d at 153 (footnotes and punctuation omitted).

The *Burbage* case (relied on by Appellants) can be distinguished because in *Burbage* the court was reviewing an award of economic damages and, consequently, the court was looking for evidence which supported an award of a specific dollar loss. *See Burbage*, 447 S.W.3d at 261 n.6 (Kirk seeks economic damages, being the business' lost value, which are distinct from the noneconomic

35

damages that are presumed in a defamation per se case - Kirk did not plead these special damages and certainly has not proven them).

Appellants also rely on *Waste Management*, but the *Burbage* court observed that the *Waste Management* court had likewise reviewed economic damages. *Burbage*, 447 S.W.3d at 260-61 (therein, plaintiff sought lost profits and a decrease in base business, which are not the sort of general damages that necessarily flow from a defamatory publication).

Thus, *Burbage* and *Waste Management* are not analogous. Because Longoria obtained general (non-economic) damages, he did not have to produce evidence of actual monetized loss. *See Waste Managment*, 434 S.W.3d at 153 (quoted above).

Although Longoria relies on business loss to prove that his reputation had been injured (people being reluctant to deal with him because he had been accused of theft), Longoria nevertheless proved general (non-economic) damages because the injury (reputation damages caused by theft accusation) was personal to Longoria and was not particularized to Longoria's economic interest. *See Medical v. Wikle*, 2013 WL 2390103, *11-12 (Tex.App.–Amarillo 2013, no pet.) (lost business opportunities and other business-related injury held to constitute some evidence of non-economic damages recompensing an injured reputation); *cf. In re*

*Lipsky*, 2015 Tex. LEXIS 350, at \*19-20 (defamation action chiefly serves to protect the personal reputation of an injured party while business disparagement or injurious falsehood applies to derogatory publications about the plaintiff's economic or commercial interests); *Williamson v. New Times, Inc.*, 980 S.W.2d 706, 710-711 (Tex.App.–Fort Worth 1998, no writ) (if damages alleged are primarily personal and general--e.g., injury to personal reputation, humiliation, or mental anguish--then cause of action is one for libel or slander, even though incidental or consequential professional losses are also proved).

### I-E. Mental Anguish Damages

**Although Longoria's mental anguish damages are presumed and need not be shown supported by evidence, Longoria's mental anguish damages are nevertheless supported by evidence.**

If for no other reason, the mental anguish damages award should be affirmed because Appellants have neither argued nor demonstrated that the evidence fails to meet the standard which was submitted to the jury. The jury charge sets the standard by which the evidence is measured. *Burbage*, 447 S.W.3d at 260. It is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge. *Id.*

Appellants argue the *Parkway* standard of review:

> [A]n award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine.

*Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

However, the *Parkway* court applied this standard expressly because it was deemed to give effect to a *definition* of mental anguish with which juries were commonly charged. *See* 901 S.W.2d at 444 (observing that the definition is the only guidance given by trial courts to juries).

The *Parkway* court identified the definition as follows:

> The term "mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

*Id.* The court characterized this as "a confounding definition of mental anguish" and "an admittedly nebulous definition." *Id.*

Here, Longoria's jury was not charged with this "confounding" and "nebulous" *Parkway* definition. Longoria's jury was not given any definition of the term "mental anguish." (CR:1052-1053)

Because the jury was not given the *Parkway* definition, Appellants' only

38

argument (being that the evidence fails to meet the *Parkway* standard of review - which is based on the *Parkway* definition) cannot establish reversible error. For that reason alone, Appellants' evidentiary challenge should be overruled. *See Ford v. Premier Installation & Design Group, Inc.*, 2013 WL 4680513, at \*25-26 (Tex.App.–Hou. [14th Dist.] 2013, no pet.) (overruling evidentiary complaint because Ford does not argue that the evidence is legally or factually insufficient to support the damage finding under the measure of damages submitted to the jury).

Moreover, Appellants have not demonstrated that the evidence is legally or factually insufficient to support the mental anguish standard which was actually submitted to the jury. *Parkway's* confounding and nebulous "relatively high degree of mental pain and distress" standard is neither commonly understood nor universally applied and, consequently, in Longoria's case the term "mental anguish" should be construed to encompass mental pain or distress of any degree. *Cf. Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex. 1986) (in context of wrongful death claim, jury should be instructed that mental anguish is "the emotional pain, torment, and suffering that the named plaintiff would, in reasonable probability, experience from the death of the family member"). Damages awarded for mental anguish do not require certainty of actual monetized loss. *Waste Management*, 434 S.W.3d at 153.

In any event, the evidence meets the *Parkway* standard. Appellants themselves introduced Longoria's affidavit, which provides: "I have suffered *humiliation* and damage to my reputation as to those who have learned of the criminal charges brought by [Appellants]." (Appendix1 / PlExh14A-15/emphasis added) By definition, this statement alone constitutes some evidence of mental anguish. *See Parkway*, 901 S.W.2d at 444 (mental anguish includes sensation of pain resulting from public humiliation).

Additionally, the mere anticipation that slander will be repeated causes mental suffering. *Southwestern Tel.*, 183 S.W. at 428. Such anticipation is evidenced by Longoria's testimony about reputation damage: "Nobody have to come and tell me, Mr. Garcia. *I can feel it.* " (RR8:213-214/emphasis added)

And there is more - but first another clarification. The following assertion is not supported by the record: "[Longoria] testified that he is in a bad mood sometimes, but he can still get up and do his daily activities and it did not disrupt those daily activities." (Brief,pp.6,24-25)

Contrary to this representation, at trial Longoria testified as follows:

Q. This alleged emotional distress never caused you any kind of illness or physical sympt[
A. Ask my wife, *I stay in a bad mood*.
Q. The emotional distress never caused you any kind of illness or physical symptoms, tru[
A. True.
Q. It did not disrupt your daily activties, true?
A. *It did disrupt my daily activities*.

40

(RR8:215/emphasis added)

Although Longoria agreed that this trial testimony differed in some respects from his deposition testimony (RR8:215-216), it is presumed that the jury accepted Longoria's trial testimony. *See City of Keller*, 168 S.W.3d at 821 (reviewing courts presume jurors resolved conflicting evidence in favor of prevailing party).

Furthermore, the foregoing reference to "ask my wife" raises an inference that Longoria's emotional distress created marital discord. "[E]vidence of marital discord, *even if brief in nature*, can be sufficient to show a substantial disruption in daily routine over and above mere worry, anxiety, vexation, embarrassment, or anger." *Wyler Indus. Works v. Garcia*, 999 S.W.2d 494, 509 (Tex.App.–El Paso 1999, no pet.) (emphasis added).

Thus, so far, applying the *Parkway* standard, there is direct evidence of:

-Nature of mental anguish: bad mood coupled with humiliation and anticipation that the slander will be repeated.

-Duration of mental anguish: all the time (stays in a bad mood).

-Severity of mental anguish: bad enough to be noticed by Longoria's wife, create marital discord, and disrupt Longoria's daily activities.

And, the duration of Longoria's mental anguish is further evidenced by other testimony. For example, Longoria testified: "Carry something you didn't do

41

for *six-and-a-half years* and see how you feel" and  "it's something that *stays with you* even if you did it or not." (RR8:214/emphasis added)

This testimony also infers deep pain and despair. *See Parkway*, 901 S.W.2d at 444 (mental anguish includes mental sensation of pain resulting from such painful emotions as despair). Longoria also testified, "It's not fair what they done to me." (RR8:201)

In this regard, the court reporter didn't capture the look on Longoria's face or the emotion in his voice. The jury saw and heard Longoria testify. The jury's mental anguish damages are due deference.

> It is within the jury's province to judge the credibility of witnesses and the weight to be given their testimony. This is especially true regarding claims for mental anguish, which are necessarily speculative claims and, thus, should be left to a jury for determination. *Part of the proof in a case includes the witnesses themselves, their demeanor, their voice modulation, and the gut feeling they project to the jurors. These are aspects of a case to which an appellate judge has no access*.

*Texas Farm Bureau Ins. Cos. v. Sears*, 54 S.W.3d 361, 376 (Tex.App.–Waco 2001) (deleting authority and punctuation, adding emphasis), *rev'd o.g.*, 84 S.W.3d 604, 613 (Tex. 2002) (finding no evidence that defendant's conduct was extreme and outrageous and thus finding no basis for intentional infliction of emotional harm claim); *see City of San Antonio v. Heim*, 932 S.W.2d 287, 296 (Tex.App.–Austin 1996, pet. den.) (jurors are best positioned to determine from

their own experience the extent to which a defendant's conduct caused compensable mental anguish).

This Court can get only a small inkling of Longoria's emotions, the tension in his voice, by listening to the audio recording of his voluntary statement (PlExh8B-1) - given to Deputy Ivy on the day that Longoria's workers were detained at the House. (transcribed statement is in PlExh8B-1) Note in particular Longoria's exasperation when he underscores the fact that he had no idea that Marcus was going to "change her mind," given the fact that she had voiced no complaint when she examined the tin in Longoria's yard. An employee had told Longoria about Marcus' visit. (RR8:253-254)

Similarly, Longoria's testimony about arriving at the House on March 11th evidences humiliation and indignation:

> Q. What did you find when you got there?
> A. All of my guys with their hands up in the air like they could kill somebody, like criminals. And I was mad. And I told the sheriff, I said, look, these people work for me.

(RR8:252-253) Regarding indignation, in responding to Smith's trial questions Longoria stated, "I used to call you amigo, but I ain't going to call you that no more." (RR8:295)

The *Parkway* court recognized that mental anguish can be proved circumstantially:

43

When claimants fail to present direct evidence of the nature, duration, or severity of their anguish, we apply traditional "no evidence" standards to determine whether the record reveals any evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger" to support any award of damages.

901 S.W.2d at 444.

And, the *Parkway* standard need not be met in a certain category of cases in which mental anguish damages are presumed - including those involving events which pose a threat to reputation:

[S]ome types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish. As a general matter, though, qualifying events have demonstrated a threat to one's physical safety or *reputation* or involved the death of, or serious injury to, a family member.

*Parkway*, 901 S.W.2d at 445 (emphasis added); *see Capps v. Nexion Health at Southwood Inc.,* 349 S.W.3d 849, 871-872 (Tex.App.–Tyler 2011, no pet.) (holding, in retaliatory discharge action, that wrongdoing which threatens a person's reputation is sufficient to support an inference that the resulting injury was accompanied by mental anguish); *Rogers v. City of Fort Worth*, 89 S.W.3d 265, 284 (Tex.App.–Fort Worth 2002, no pet.) (same holding, in whistleblower action).

Here, the underlying events clearly posed a threat to Longoria's reputation and as such independently support an inference of mental anguish. Appellants'

44

theft accusations made Longoria the fall guy in an insurance scheme which resulted in Longoria's arrest.[83] Almost eight months passed between Longoria's arrest and the grand jury's no bill - during which time Appellants spread the word of Longoria's arrest.[84]

These circumstances alone raise an inference of mental anguish sufficient to support the award. *See Valley Nissan, Inc. v. Davila*, 133 S.W.3d 702, 716 (Tex.App.–Corpus Christi 2003, no pet.) (the public humiliation of having one's truck repossessed provides some evidence to support the jury's finding on mental anguish); *Strong v. Nicholson*, 580 So. 2d 1288, 1295 (Miss. 1991) (it may be inferred that plaintiffs suffered some damages resulting from the mental anguish and distress associated with being arrested); *cf. South Tex. Freightliner, Inc. v. Muniz*, 288 S.W.3d 123, 135 (Tex. App. Corpus Christi 2009, pet. den.) (affirming award of mental anguish damages in malicious prosecution action where plaintiff testified that he was tense, sad, had anger, and was embarrassed by arrest and by weekend in jail); Appendix1 / PlExh14A-15 (Longoria suffered humiliation); RR8:263 (Longoria was embarrassed).

One court, in affirming an award of DTPA mental anguish damages (failure

---

[83](Supra,pp.10-18;  CR:338-339; RR5:40,57-66; RR6:182-186; RR9:173-175)

[84](Appendix6 / PlExh7A; Appendix9 / DefExh1; RR7:146; RR8:280; RR9:19)

to service a mobile home), held as follows:

> Our cautious recommendation is that in proving up claims for mental anguish damages, a detailing of descriptive adjectives may be required, especially where overall facts inadequately project that thread of human understanding and emotional feeling, by nature, common to most. Where however, as here, those overall facts create such an intensity of commonly shared emotions to which the factfinder can understand and relate without benefit of prompting, we impose no requirement for detailing.

*Tony Houseman Assocs. v. Couch*, 1996 WL 125529, *34-35

(Tex.App.–Beaumont 1996, no writ).

### *I-F. Exemplary Damages*

**Because Appellants' only complaint about exemplary damages is that they cannot be recovered without an award of actual damages, it follows that Longoria should recover the exemplary damages awarded if he recovers any amount of actual damages.** *See* CR:1054-1056 (jury determined exemplary damages).

## II. EVIDENCE SUPPORTING ATTORNEY'S FEES

Longoria's attorney's fee award is supported by evidence. Longoria recovered damages, but his attorney's fee award is not dependent on a recovery of damages.

"The availability of attorney's fees under a particular statute is a question of law for the court." *Holland v. Wal-Mart Stores*, 1 S.W.3d 91, 94 (Tex. 1999).

**Longoria is entitled to attorney's fees and costs under the Uniform Declaratory Judgments Act, which authorizes "the court" to award attorney's fees that are equitable and just. CPRC § 37.009.**

The original petition included a request for declaratory relief and Appellants later filed a supplemental petition which incorporated the prior request for declaratory relief. (CR:9,121-122) The court effectively ordered that Appellants take nothing on their claim for declaratory relief (Appellants not having been granted such relief and all requested relief not granted being denied). (CR:1082-1085)

Longoria pleaded for UDJA attorney's fees under CPRC § 37.009. (CR:339) Section 37.009 does not condition an attorney's fees award on a recovery of damages.

Appellants' Brief makes no mention of Section 37.009. Thus, if for no other

reason, Longoria's attorney's fee award should be affirmed because Appellants have not attacked all independent bases for the award. *See Britton v. Tex. Dep't of Crim. Justice*, 95 S.W.3d 676, 681 (Tex.App.–Hou. [1st Dist.] 2002, no pet.) (if an appellant does not attack all independent bases or grounds supporting a complained-of ruling or judgment, then the complaint must be overruled).

**Additionally and alternatively, Longoria is entitled to attorney's fees and costs under CPRC Chapter 134, the Texas Theft Liability Act (TTLA).** Because Appellants' Brief makes passing reference (one sentence) to TTLA attorney's fees, its application will be addressed in the context of Appellants' arguments.

Appellants pleaded that Longoria committed theft and sought TTLA damages. (CR:122). The TTLA provides that a person who commits theft is liable for the damages resulting from the theft. CPRC 134.003(a).

The TTLA provides that "[e]ach person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees." CPRC § 134.005(b). Both Longoria and Appellants sought TTLA attorney's fees. (CR:122,124,339; RR9:30,48)

Recovery of TTLA attorney's fees does not depend on an award of damages. "[T]he Texas Theft Liability Act provides for attorney's fees even

48

without an underlying damages recovery." *In re Corral-Lerma*, 451 S.W.3d 385, 386 (Tex. 2014).

The TTLA requires the court to award attorney's fees to a party who successfully *defends* a TTLA claim. *Air Routing Int'l Corp. v. Britannia Airways, Ltd.,* 150 S.W.3d 682, 686 (Tex.App.–Hou. [14th Dist.] 2004, no pet.). The award of TTLA fees to a  prevailing party is mandatory. *Arrow Marble, LLC v. Killion*, 441 S.W.3d 702, 705 (Tex.App.–Hou. [1st Dist.] 2014, no pet.).

Longoria prevailed on – successfully defended against – Appellants' TTLA claim and thus is entitled to TTLA attorney's fees. When a TTLA claim is resolved in a manner which precludes a plaintiff's right to reassert the claim - such as by application of res judicata - then the defendant has prevailed and is entitled to recover TTLA attorney's fees. *Arrow Marble*, 441 S.W.3d at 707. Res judicata bars the relitigation of claims that have been finally adjudicated. *Daniels v. Empty Eye, Inc.,* 368 S.W.3d 743, 754 (Tex.App.–Hou. [14th Dist.] 2012, pet den.).

Appellants' TTLA claim was finally adjudicated by a take nothing judgment. Appellants sought TTLA relief, were awarded no TTLA relief, and the court ordered that all requested relief not expressly granted was denied. (CR:122,1085) Thus, Appellants' TTLA claim was resolved in a manner which precludes Appellants' right to reassert the claim. Moreover, although not required,

49

Longoria effectively obtained a finding that he had not committed theft. (CR:1049 - jury found theft accusation was false)

Appellants' only reference to TTLA attorney's fees is an argument that Longoria's right to TTLA attorney's fees was waived by the jury's failure to answer Jury Question 8 (Appellants' TTLA liability issue - asking whether Longoria committed TTLA theft). However, the jury did not reach Question 8 because it was conditioned on a positive response to Appellants' conversion issue - which was resolved against Appellants. (CR:1034,1041) Appellants' failure to prove their TTLA claim does not preclude an award of TTLA attorney's fees - indeed, as was demonstrated, it serves as the basis for a TTLA attorney's fee award.

With neither argument nor authority, Appellants argue in a footnote that there is no "legal basis" for the jury to have answered Jury Question 11 (Longoria's attorney's fee issue) - given that the answer was conditioned on a "no" response to Question 8 (TTLA theft) which question, as noted, was not reached by the jury.

The "legal basis" for the jury's answer to Question 11 is the court's instruction. After receiving a note from the jury, the court determined that Question 11 was improperly predicated and thus instructed the jury to answer

50

Question 11. (RR9:194-196; SuppCR42) Appellants have not shown any abuse of discretion in the giving of this instruction. *See* TRCP 286 (after having retired, the jury may receive further instruction from the court).

**Longoria's attorney's fee award is supported by evidence.** With little and often no argument or authority, Appellants shotgun a number of complaints about the evidence supporting Longoria's attorney's fees, including complaints about a failure to provide attorney hours worked and a general failure to provide a basis for reasonableness.

Appellants complain that Longoria's counsel presented no evidence regarding attorneys' fees other than by *stating* that Longoria had a one-third contingent fee agreement. (Brief,p.26) To the contrary, counsel presented *evidence* - much of it coming from the lips of Appellants' counsel.

*Longoria testified* that he and his counsel had entered into a fee agreement whereby counsel would be paid 1/3 of any recovery. (RR8:275-277) Longoria asked the jury to add 1/3 additional as attorney's fees on top of whatever he is awarded. (RR8:277) Longoria testified that employing counsel at an hourly rate was not financially feasible. (RR8:277) In this Court, Appellants have not mentioned - much less complained about - Longoria's testimony.

*Appellants' counsel Garcia testified* that he had practiced law for 11 years,

51

that he was paid a flat fee of $7,500 up front, and that he will get 40 to 45 percent of any recovery (with his client paying expenses). (RR9:43,48-50) Garcia testified that an appellate fee of $30,000 to the court of appeals, and $20,000 to the Supreme Court, would be reasonable, necessary, and customary. (RR9:47)

Garcia acknowledged: that Longoria's counsel Blanks has practiced law for 39 years and Longoria's counsel Torrey had practiced law for 38 years; and, that Blanks has been board certified for 34 of those 39 years. (RR9:48-49) Garcia agreed that during the course of the litigation "it's pretty much been an equal process" in that one side would file a motion then the other side would respond; "we take your depositions, you take ours." (RR9:50)

Garcia testified that Rule 1.04 requirements (which he equated with Lone Star requirements - perhaps a misnomer)[85] are designed to determine a fair attorney's fee. (RR9:49) The Supreme Court has identified these Rule 1.04 requirements as being factors that a factfinder should consider when determining the reasonableness of a fee. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (listing requirements); PlExh16D & PlExh16E

---

[85]It seems probable that the court reporter thought that the attorney said "Lone Star requirements" when he actually referenced the "lodestar requirements." *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (referencing the lodestar method of awarding attorney's fees). In any event, from the context it is clear that record references to "Lone Star requirements" are intended to be a shorthand reference to Rule 1.04 requirements. (RR9:49)

(summarizing). These Rule 1.04 requirements correspond to the factors which the jury was instructed to consider in determining Longoria's attorney's fee. *See* Jury Question 11 (CR:1044).

Garcia also testified:

Q. [BLANKS] If we go down the Lone Star requirements again – and I'll do those if we need to -- wouldn't you think that with our experience and certifications and knowing that it's a punch/counter punch in this case, that *if you meet the Lone Star requirements, Mr. Torrey and I would, as well?*
A. [GARCIA] *I would suspect so.*
Q. Okay. And the only difference as far as the contingency goes, and I'm not faulting you, but you have a 40/45 and Mr. Torrey has testified that we have a one -- Mr. Longoria that we have a one-third -- flat one-third, it doesn't change?
A. That's my understanding, yes.
Q. So if you're testifying at 40/45 is appropriate, and I have no problem with that, certainly one-third would also be an appropriate fee structure?
A. *A one-third fee structure is an appropriate fee structure*, yes. Different considerations, but yes.
Q. And if it's going to cost your side *30,000 to appeal to the first level and another 20,000 to the Supreme Court*, we don't even know who might be doing that appeal at this point, right?
A. True.
Q. So when you say appeal, that's whether you win the case and appeal or lose the case and appeal, right? If you win the case, you don't appeal.
A. I'm sorry, you lost me.
Q. Lose the case, you appeal, or if you win the case and have to answer the other side, the fee remains the same, 30 and 20?
A. Generally, yes, those are customary fees.
Q. And *that is, again, a goose/gander, if that's a permissible and fair fee for you, it would be for our side, as well?*
A. *Yes.*

53

(RR9:50-51) (emphasis added)

*Appellant Smith (representing himself pro se) testified*, "I'm asking for the attorney's fees, if necessary on appeal, that Mr. Garcia and Mr. Blanks, Mr. Torrey have talked about. I believe that *those fees are reasonable and customary*." (RR9:56) (emphasis added)

Appellants don't mention, much less complain about, any of this *testimony*. Garcia conceded that Longoria's counsel's one-third contingent fee "is an appropriate fee structure." (RR9:50) Garcia further testified that this contingent fee and the $50,000 for appeal is a "permissible and fair fee" for Longoria's attorneys. (RR9:50-51) This alone supports Longoria's attorney's fees.

Moreover, Garcia's Rule 1.04 concession (that the Rule 1.04 requirements were satisfied) bolsters this evidence. *See Southwest Grain Co. v. Garza*, 2007 WL 1087179, at *39-40 (Tex.App.–Corpus Christi 2007, pet. den.) (affirming a contingent fee award supported by testimony satisfying the Rule 1.04 requirements). Here, Longoria's counsel offered to prove up the Rule 1.04 requirements, "I'll do those if we need to." (RR9:50) However, the need to do so was obviated when Garcia conceded that Longoria's counsel would meet those requirements. (RR9:50)

Appellants' Brief makes no reference to Rule 1.04. Although they complain

54

about a failure to produce attorney time records and a failure to prove the hours spent on each task, they offer no authority for such a requirement and ignore Garcia's Rule 1.04 concession. (Brief,p.26)

Although Appellants argue that "Longoria's counsel presented no evidence regarding attorneys' fees other than by *stating* that he had a one-third contingent fee agreement," they do not argue that the attorney's fee award cannot be based on proof of such an agreement. (Brief,p.26-emphasis added)

The jury determined Longoria's trial attorney's fees to be an amount that totals slightly less than one-third of Longoria's damages and determined Longoria's appellate attorney's fees to be the amount proved up by Garcia and Smith. (CR:1044,1052-1053) The court awarded these amounts. (CR:1083-1084). The award is supported by the evidence.

**Any failure to apportion attorney's fees does not require reversal**. In the middle of a compound sentence stating three complaints, without any argument or authority, Appellants assert that Longoria's counsel "did not apportion the fees between the causes of action on which attorney's fees are recoverable . . . ." (Brief,p.26)

By Jury Question 11, the jury was broadly asked to find a fee for the services of Longoria's attorneys. (CR:1044) The jury was not instructed to limit

consideration to any particular claim or theory. If Longoria had apportioned his attorney's fees between claims, the jury would not have known how to apply such an apportionment. Thus, any failure to apportion was harmless.

Additionally, the apportionment complaint was waived by Appellants' failure to timely and specifically object to Question 11's broad scope and, additionally, by Appellants' failure to obtain a ruling on any such objection. *See Matthews v. Candlewood Builders, Inc.,* 685 S.W.2d 649, 650 (Tex. 1985) (complaint about failure to apportion fees was waived where jury issue broadly requested jury to find attorney's fees for the entire case, rather than separately allocating the fees to each claim); TRCP 274 (complaint is waived unless party objecting to charge points out distinctly the objectionable matter and the grounds of the objection - no objection to one part of charge may be adopted and applied to any other part of the charge by reference); TRAP 33.1 (as prerequisite for presenting complaint for appellate review, record must show both a timely objection and ruling).

Absent an objection to the form of the jury question, any complaint about the sufficiency of the evidence to support an attorney's fee determination is based on the determination as a whole. *Miranda*, 390 S.W.3d at 552. Non-apportioned attorney's fees for the entire case are some evidence of what the apportioned

amount should be. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006).

Moreover, Appellants' counsel Garcia conceded that the one-third contingent fee and the $50,000 for appeal is a "permissible and fair fee" for Longoria's attorneys. (RR9:50-51) Garcia did not draw any distinctions about claims that will, or will not, support an award of attorney's fees.

Furthermore, Longoria's counsel was not required to apportion fees - because the record shows that counsel's services advance all claims such that they are inextricably intertwined and cannot be apportioned. When discrete legal services advance both a recoverable and unrecoverable claim, then the services are so intertwined that they need not be apportioned. *Tony Gullo*, 212 S.W.3d at 313-314.

All of Longoria's counsel's services (both in prosecuting and defending claims) furthered a defense of the TTLA claim. Longoria is entitled to an award of TTLA attorney's fees and the issue which is central to that claim - whether Longoria committed theft - is an issue common to every other claim and defense asserted by Longoria and Appellants.

In this regard, Appellants concede that the theft accusation is central to all theories and defenses. (Brief,p.17) Moreover, Appellants' counsel Garcia, in

57

proving up his own attorney's fees, relied on the "inextricably intertwined" argument in testifying that it was not possible to separate out attorney's fees attributable to one claim or the other. (RR9:48)

**Any failure to condition appellate attorney's fees on success does not require reversal.** The record does not show that the complaint (about failure to condition appellate attorney fees on success) was preserved - does not show that the complaint was presented to or ruled on by the trial court. *See* TRAP 33.1. Even if the complaint had been preserved, any error could be cured by modifying the award and conditioning appellate attorney's fees on a successful outcome. *See R & R Res. Corp. v. Echelon Oil & Gas*, 2011 Tex. App. LEXIS 295, at *43 (Tex.App.–Austin 2011, pet. den.).

## III. CHALLENGE FOR CAUSE

Appellants complain that three veniremembers challenged for cause served on the jury.

### III-A. Complaint Not Preserved

**Appellants failed to preserve complaint about the trial court's ruling on their challenge for cause.** "[T]o preserve error when a challenge for cause is denied, a party must use a peremptory challenge against the veniremember involved, exhaust its remaining challenges, and notify the trial court that a specific objectionable veniremember will remain on the jury list." *Cortez ex rel. Estate of Puentes v. HCCI-San Antonio, Inc.,* 159 S.W.3d 87, 90-91 (Tex. 2005), *citing Hallett v. Houston Northwest Medical Center*, 689 S.W.2d 888, 890 (Tex. 1985). The record does not show that Appellants followed this procedure (herein "the Hallett procedure" or "the Hallett objection" or "the Hallett notice").

Appellants' brief does not reference the Hallett procedure. Appellants do note that they requested additional strikes. In this regard, the record shows that immediately after the challenge for cause was denied, there was an exchange between Appellants' counsel and the court:

> [THE COURT]: And so I -- I'm just concerned about the confusion created by some of the questioning, which I think you can clear up in opening statements. But I don't think there's been a showing here of any appropriate cause so I'm going to deny the challenges for cause

59

on the basis  -- on those two bases.

MR. SMITH: Your Honor, we would then request more strikes for additional jurors.

THE COURT: Overruled.

MR. SMITH: We're put in a position where I believe the record is pretty clear about having to accept jurors that require a higher burden of proof and a criminal conviction.

THE COURT: I am concerned. I gave you extra time for your voir dire, just to take this into account and to be able to explore all of those issues and it was just confined to too short a period of time to make it clear at the very end. So I'm going to deny the request for extra strikes.

MR. SMITH: Would the Court at least question the jurors as a whole before the panel is selected to see? And, of course, comfort zone, whether or not, you know, I give you the law, this is the law, this is what's going to happen. Can y'all follow it? Could we at least do that?

THE COURT: I'll be glad to do that.

MR. GARCIA: Are we doing that -- I'm sorry, just to clarify. Would that be done with this group of specific jurors?

THE COURT: I'll do that right now with the entire panel and then we'll break for you to exercise your peremptory challenges.

MR. SMITH: Thank you.

(RR4:141-143)

This exchange between Appellants' counsel and the court will herein be referenced as the "Exchange." After the Exchange, the parties then discussed the procedure by which peremptory challenges would be made, the court then gave "the instruction as requested by [Appellants]," Appellants made no further request, and the parties then exercised their peremptory challenges. (RR4:143-147)

*Appellants failed to identify (either by name or number) specific objectionable veniremembers that would remain on the jury list.* During the

60

Exchange, objectionable veniremembers were not identified. *See Cortez*, 159 S.W.3d at 90-91 (to preserve error, a party must notify the trial court that a *specific* objectionable veniremember will remain on the jury list); *Hallett*, 689 S.W.2d at 889 (rejecting argument that once a veniremember has been challenged for cause, the trial court is aware that the person is objectionable to the challenging party).

The *only* request overruled was a request for "more strikes for additional jurors." (RR4:141-143) Appellants did not even specify the number of extra strikes being requested.

*If Appellants are deemed to have identified specific objectionable veniremembers, it was not shown to have been timely done.* If the record does not clearly show that the Hallett notice was timely given, any complaint regarding the failure to strike for cause is waived. *See McCluskey v. Randall's Food Mkts., Inc.*, 2004 WL 2340278, at *5 (Tex.App.–Hou. [14th Dist.] 2004, pet. den.) (complaint waived where record did not clearly show notice was timely given).

The Hallett notice can be given only after the peremptory challenge list has been prepared. This timing is necessarily implied by the nature of the notice to be given (that specific objectionable veniremembers would remain on jury list after peremptory challenges are exercised). One obvious purpose of the notice is to give the trial court the opportunity to reconsider its ruling in the context of the impact

61

that it actually had, not the impact that the ruling might have, on the jury to be selected.

The record does not show that the Exchange occurred after Appellants' peremptory challenge list had been prepared. If anything, the record shows that the Exchange occurred before Appellants' peremptory challenge list had been prepared. The Exchange occurred without interruption immediately after the challenge for cause was overruled. (RR4:141-142). Additionally, it was after the Exchange that the parties and court began discussing the procedure by which peremptory challenges would be exercised. *See e.g.* RR4:142-143 – court will first give requested instruction and "then we'll break for you to exercise your peremptory challenges".

*Appellants failed to exhaust their peremptory challenges on veniremembers who were challenged for cause.* "[T]o preserve  error when a  challenge for cause is denied, a party must use a peremptory challenge  against the veniremember involved." *Cortez*, 159 S.W.3d at 90.

In this regard, Appellants selectively used one of their peremptory challenges to strike Veniremember 20 - who was not challenged for cause. (SuppCR:38; Appellants' Brief, p.13) But for this peremptory challenge,

Veniremember 20 would have served on the jury. (SuppCR:20-28)[86] Appellants

could have used, but failed to use, this peremptory challenge to strike one of the

three veniremembers challenged for cause who served on the jury.

Appellants challenged as many as sixteen veniremembers for cause, and

Appellants only had six peremptory challenges, but the Hallett rule required

Appellants to use all of those strikes on veniremembers who were challenged for

cause. *See McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 194 (Tex.App.–Austin

2005, pet. den.) (McMillins were required to use all six remaining peremptory

challenges on veniremembers they had challenged for cause).

In *McMillin*, this Court found only partial waiver where a party failed to

exhaust peremptory challenges on veniremembers who were challenged for cause.

However, *McMillin* did not involve the special "undue advantage" consideration

discussed in the next section.

Additionally, in *McMillin* the party challenging for cause apparently had

informed the trial court that they would exhaust their peremptory challenges and

apparently had identified specific objectionable veniremembers that would remain

on the panel. *Id.* at 193-94. As noted, Appellants did not follow the Hallett

---

[86]The conclusion that Veniremember 20 would have served on the jury, but for Appellants' peremptory challenge, follows from the fact that the jurors were chosen in numerical order and from the fact that Veniremembers 21 and 22 served on the jury. (SuppCR:20-26; Appellants' Brief, p.15)

procedure. *See also Williams v. Skelton*, 2007 WL 899907, at \*3 (Tex.App.–Waco 2007, pet. den.) (complaint not preserved where Williams failed to exhaust peremptory challenges on veniremembers who were challenged for cause / distinguishing *McMillin* on ground that Williams failed to identify specific objectionable veniremembers that would remain on the panel).

*Appellants secured an undue advantage by using one of their peremptory challenges on a Hispanic-surnamed veniremember who was not challenged for cause.* As noted, the Hallett rule required Appellants to exhaust their peremptory challenges on veniremembers who were challenged for cause. Appellants violated the Hallett rule by selectively using one of their peremptory challenges to eliminate Veniremember 20 - who was not challenged for cause. (SuppCR:38; Appellants' Brief,p.13)

Both Veniremember 20 and Longoria have Hispanic surnames. (SuppCR:38) By peremptorily challenging Veniremember 20, Appellants assured that Veniremember 20 would not be empaneled. As noted, but for this peremptory challenge, Veniremember 20 would have served on the jury. (SuppCR:20-28) Appellants also peremptorily challenged the other two veniremembers having

Hispanic surnames (Veniremember 9 and Veniremember 24).[87] (SuppCR:38)

Appellants repeatedly complain in this Court that the jury was "stacked against" them. (Brief,p.16-17,31-32) However, it appears that Appellants did the stacking.

Appellants complain that the court's cause challenge ruling prevented them from obtaining a jury to which they were entitled. However, by their own conduct (in failing to follow the Hallett rule) Appellants obtained a jury to which they were not entitled (jurors without Hispanic surnames).

Hence, as a matter of equity, Appellants should not be heard to complain about the court's challenge for cause ruling. Appellants cannot secure an advantage by failing to follow the rule and then complain that the rule was not followed. *See Hallett*, 689 S.W.2d at 889 (courts have developed the procedure to be followed when challenge for cause is denied); *Smirl v. Globe Laboratories*, Inc., 188 S.W.2d 676, 678 (Tex. 1945) (where courts have established a practice, it is competent for the courts so to adapt its exercise as to prevent any particular oppression and to make it yield to the particular circumstances of the case).

---

[87]On their information cards, under "Race," Veniremembers 9, 20, and 24 all listed "Hispanic." (SuppCR:22,26-27)

*III-B. No Abuse Of Discretion*

**Even if complaint had been preserved, the court did not abuse its discretion by overruling Appellants' challenge for cause**.

*The error assigned in this Court differs from the complaint made at trial.* Objections on appeal must conform to those made at trial or they are waived. *Knoll v. Neblett*, 966 S.W.2d 622, 639 (Tex.App.–Hou. [14th Dist.] 1998, pet. den.).

When the court asked Appellants to articulate their challenge for cause, Appellants responded that it was "based upon the . . . preponderance of the evidence, your Honor, and based upon Mr. Smith's collective questioning when he went back, they would hold us, I think, *all parties* to a higher standard." (RR4:136 - emphasis added) In contrast, in this Court Appellants object that the jury held only Appellants to a higher standard of proof, as follows: "The jury held the Shamark Parties to the higher standard of proof of 'beyond a reasonable doubt.'" (Brief,p.7)

Having argued in the trial court that the higher standard would be applied to all parties, Appellants should not be heard to argue in this Court that the challenged veniremembers applied a different standard of proof to Appellants only. The distinction is significant, given Appellants' insistence in this Court that

the veniremembers were not confused and Appellants' insistence that the jury was stacked against them. (Brief,pp.31-32).

*In any event, the challenged veniremembers did not exhibit a bias.* The veniremembers did not express an unequivocal refusal or inability to follow the court's instructions. They instead exhibited (at worst) confusion, misunderstanding, and ignorance of the law which ultimately was dispelled (rehabilitated) by Longoria's counsel and the trial court.

The Supreme Court has rejected cases holding that once a veniremember has expressed "bias," further questioning is not permitted and the veniremember must be excused. *See Cortez*, 159 S.W.3d at 91 (no such rule). Because trial judges are actually present during voir dire, they are in a better position to evaluate the veniremember's sincerity and his capacity for fairness and impartiality. *Id.* at 93. Therefore, trial courts exercise discretion in deciding whether to strike veniremembers for cause when bias or prejudice is not established as a matter of law, and there is error only if that discretion is abused. *Id.*

*The challenged veniremembers exhibited (at worst) confusion, misunderstanding, and ignorance of the law.* Several veniremembers expressed confusion about the standard of proof. *See e.g.* RR4:79 (don't understand); RR4:79 (having trouble understanding); RR4:80-81 - difficulty understanding

how "more likely than not" standard is applied; RR4:86-90 - difficulty with concept of circumstantial evidence.

Appellants specifically complain (Brief,p.31) that after the veniremembers were read an instruction on preponderance of the evidence, sixteen of them raised their cards in response to the following:

> Now, having given the definition that I believe the Judge will give you, can you decide this case on preponderance of the evidence, or are you going to require a different, higher burden of proof for us as the people bringing the initial lawsuit? Does that help any? So can you please raise your hand if you require a higher burden of proof, a number.

(RR4:103)

By raising their cards in response to the question, the sixteen veniremembers did not express an unequivocal refusal or inability to follow the court's instructions. Counsel expressed only a "belief" that the court would give the instruction on preponderance and did not condition the response on an assumption that the instruction would in fact be given. Counsel did not ask: "If the court gives that instruction on preponderance, would you refuse to apply it?"

Thus, at worst the veniremembers' response indicates a mere preference as to how the law should be applied. More likely they were just confused. Veniremembers do not express bias as a matter of law merely by raising their hands in response to a question. *See e.g. Smith v. Dean*, 232 S.W.3d 181, 191-92

(Tex.App.–Fort Worth 2007, pet. den.) (by raising hands to show agreement with another veniremember, veniremembers did not show bias as a matter of law).

Also, the question's reference to "a higher burden of proof, a number" lacks clarity. The response does not require disqualification as a matter of law. *See Union Pac. R.R. v. Legg*, 2009 WL 2476636, at *19 (Tex.App.–Austin 2009, no pet.) (question had potential to be misconstrued and, therefore, was insufficient to result in disqualification as a matter of law for a group of veniremembers who simply raised their hands in response).

Appellants also complain (Brief,p.31) that eight veniremembers held up their cards in response to the following

> MR. SMITH: Let me ask this, the last question I have. Would everyone or anyone require a criminal conviction in order to award money in a civil case for theft? Can I see the numbers of those people? Eight, 9, 12, 13, 31, 26 and 24 and 49.
> THE COURT: Thank you, Mr. Smith.
> MR. SMITH: Thank you all for sharing.

(RR4:108)

The eight veniremembers did not thereby express an unequivocal refusal or inability to follow the court's instructions. Nothing was said about the court's instructions. The question was not even particularized to the facts of the case, the reference being to "a civil case for theft." The response does not require disqualification as a matter of law.

69

*Any confusion was dispelled (rehabilitated) by Longoria's counsel and the trial court. See Cortez,* 159 S.W.3d at 93 (if a veniremember expresses what appears to be bias, we see no reason to categorically prohibit further questioning that might show just the opposite or at least clarify the statement).

Mr. Blanks, Longoria's counsel, explained that this is a civil case, not a criminal case: "The standard is different." (RR4:113) Blanks explained that both sides are claiming that the other did something wrong and seeking money damages. (RR4:113-114) Blanks explained that both sides rely on a "more likely than not" civil standard. (RR4:114)

Blanks then obtained the veniremembers' commitment to apply the civil standard of proof, as follows:

> The question is -- here we go: Can you listen to the evidence without prejudging either side, understanding that both sides are saying the other side did something wrong? And can you use your life's experiences, your common sense? Can you use those things to sift through the evidence and simply make a decision about what is more likely than not to have happened? And that is really the standard, more likely than not. How can we resolve disputes between people in this county? That's the standard, by what is more likely than not. And if you can't reach that decision, if you can't do that, then you say there's not enough evidence one way or the other, I'm not going to do it. Burden of proof is your common sense applied to the facts of this case and you say it's more likely than not Martin or these folks are telling the truth. When you head out of here, you're going to do that in every other venue and every other place in your life. Is there a reason you can't do it here? If you can't do it here, raise your card.
> (No response.)

70

(RR4:127-128)

Appellants do not argue that Blanks misstated the law. He did not. *See In re Lipsky*, 2015 Tex. LEXIS 350, at \*12 (civil cases typically apply the preponderance-of-the-evidence standard, that is, a fact-finder's determination that the plaintiff's version of the events is more likely than not true).

Appellants argue that Blanks' rehabilitation "was not specific to the issue of applying the proper burden of proof to the issue of theft." (Brief,p.13) However, Blanks explained that both sides are claiming that the other did something wrong, explained that both sides rely on a "more likely than not" civil standard, and explained that the veniremembers would be asked to apply that standard to determine who is telling the truth. (RR4:113-114,127-128)

Later, in overruling Appellants' challenge for cause, the court expressed concern that Appellants' questioning had confused the veniremembers, observed that Blanks' questioning had remedied that confusion, determined that there was no basis to strike veniremembers for cause, and denied a global nonspecific request for additional strikes. (RR4:138-141)

Thereafter, Appellants asked the court to further question the veniremembers "as a whole." (RR4:142) The court did - and thereby obtained the veniremembers' commitment to apply the civil standard of proof, as follows:

71

THE COURT: All right. One last question for you before we take our final break, which is not a lunch break yet, is: You have heard discussion and questions concerning both civil and criminal cases, and as I advised you at the beginning of this case, this is a civil case, and I will advise you at the conclusion of the case and the lawyers would -- may argue between now and then about the preponderance of the evidence, which is the standard of proof in a civil case. You will also hear some testimony about a criminal matter in this case, which has a different burden of proof and you've also heard some questioning about that during the voir dire. Is there anyone here who has an understanding of either a civil or criminal law that will not allow them to follow the instructions that I as the Court give you concerning preponderance of the evidence, how that burden of proof is allocated between the parties and how it is shown? You are the judges of the facts and you will follow the law as I gave it to you. Is there anyone here who has -- who thinks they will be unable to follow the law as I will give it to you at the conclusion of this case?
(No response.)
THE COURT: Absolutely anyone for any reason?
(No response.)

(RR4:145-146)

After this instruction was given, Appellants made no further objection and the parties exercised their peremptory challenges. (RR4:146-147) As far as the trial court knew, Appellants were satisfied that the instruction cured any error. Appellants should not now be heard to argue that the instruction did not cure error (if any).

Appellants complain without argument or authority that "[t]here was no individual voir dire of any juror to undermine [SIC] their purported understanding of the issues." (Brief,p.31) However, Appellants failed to preserve complaint

72

about a failure to conduct individual voir dire. The record does not show that Appellants asked the court to individually question the veniremembers and does not show that any such request was overruled. Thus, complaint was not preserved. See TRAP 33.1.

More to the point, Appellants are estopped from complaining about a failure to conduct individual voir dire. The record shows that Appellants got that which they requested - they asked the court to question the veniremembers "as a whole." (RR4:142) *See Northeast Texas Motor Lines, Inc. v. Hodges*, 158 S.W.2d 487, 488 (Tex. 1942) (a litigant cannot ask something of a court and then complain that the court committed error in giving it - the litigant is estopped).

Moreover, because the veniremembers' responses were given as a group (raised cards), the responses can be rehabilitated in the same manner. *See Smith*, 232 S.W.3d at 192 (veniremembers who previously had raised their hands in response to a question could be rehabilitated in the same manner). There was no abuse of discretion. *See Murff v. Pass*, 249 S.W.3d 407, 411 (Tex. 2008) (trial judges are given wide latitude both in conducting voir dire proceedings and in determining whether a panel member is impermissibly partial).

## PRAYER

Longoria prays:

1. That the judgment be in all matters affirmed.

2. That Longoria recover his damages, attorney fees, and costs.

3. That Longoria have such other relief as to which he has shown himself entitled.

Respectfully submitted,

*James D. Walker*

JAMES DAVID WALKER
P. O. Box 41
Milano, Texas 76556
SBOT 20706000
Phone: (512) 636-9520
Fax:     (512) 455-7922
Email: walker@2appeal.com
COUNSEL FOR
MARTIN M. LONGORIA

W.W. TORREY
P.O. Drawer 752
Cameron, Texas 76520
SBOT 20144700
Phone: (254) 697-7013
Email: wwtorrey@torreylaw.net
COUNSEL FOR
MARTIN M. LONGORIA

## CERTIFICATE OF WORD COUNT

I certify that this document contains 14,923 words (per WordPerfect X6).

*James D. Walker*

## CERTIFICATE OF SERVICE

I certify that on June 5, 2015, this document was electronically served on Counsel for Appellants:
Tracy J. Willi
twilli@willi.com

*James D. Walker*

**APPENDIX**
**to**
**Appellee's Brief**

The Reporter's Record document volumes are not consecutively numbered.

Reporter's Record (RR) document references are to PDF page numbers.

Example: RR10:261 is the 261st page in Reporter's Record Volume 10.

1. Longoria's Affidavit
PlExh14A-15
RR10:261

2. Longoria's Voluntary Statement Given to Deputy Ivy
Transcribed
(PlExh8B-2)
RR10:145
The record also contains the Audio recording of this statement, being PlExh8B-1

3. Marcus' Handwritten Statement
PlExh6B
RR10:134

4. Marcus' Typed Statement
(differs from handwritten statement)
PlExh6A
RR10:132

5. List of Property Values Submitted to Sheriff
PlEx24
RR11:53

6. Deputy Ivy's Investigative Report
PlExh7A
RR10:135

7. Deputy Ivy's Probable Cause Affidavit
PlExh7B
RR10:140

8. Smith's Grand Jury Submission (Direct File)
PlExh29
RR11:70

9. Grand Jury No Bill
DefExh1
RR12:137

10. Smith's Sworn Proof of Loss Submitted to Insurance Company
PlExh25
RR11:54

11. Notice of Insurance Claim Reported 3/3/2008
DefExh1
RR12:14

12. Insurance Claim Red Flagged
DefExh1
RR12:64

13. Insurance Claim Paid
DefExh1
RR12:39

14. Jury Charge
CR1031

1. Longoria's Affidavit
PlExh14A-15
RR10:261
Appendix1

## CAUSE NO. 32,515

SHAMARK SMITH LIMITED, Partnership   ı   IN THE 20TH JUDICIAL
      Plaintiff

VS.                               DISTRICT COURT OF

MARTIN M. LONGORIA
      Defendant                   MILAM COUNTY, TEXAS

### AFFIDAVIT

STATE OF TEXAS      §
COUNTY OF ~~BELL~~ Milam    §

BEFORE ME, the undersigned authority, on this day personally appeared Martin M. Longoria, who, being by me duly sworn, stated on his oath as follows:

My Name Is Martin M. Longoria. I am the Defendant/Counter-Plaintiff in the above numbered and styled cause. I am over the age of 18 years and am competent to testify in this matter. I offer the following sworn testimony:

1. I performed contract labor for Sharon Marcus and Paul Smith for several years before March of 2008, including planting grass, fencing, working cattle and trapping hogs.
2. I had talked with Paul Smith sometime in 2007 about the old plantation house. Paul and I were driving by the house and he asked me what I thought should be done with the house, either tear it down or just burn it. Then he said that we should talk to his wife, Sharon Marcus, about what to do with the house. I think that conversation took place around December of 2007.
3. I had been in the old plantation house a number of times. I used to store corn for my hog traps inside. About a month after my conversation with Paul, probably in January of 2008, I went inside the house to get corn out. The house was unlocked and there was nothing in the house. All interior doors were open.
4. In late February 2008, I asked Sharon Marcus what she was going to do with the old plantation house. She first told me that the house had no value and she was going to bulldoze it but then in the same conversation



PLAINTIFF'S
EXHIBIT
14 A (15)

PENGAD 800-631-6989

she offered to let me have the tin off the house if I would save the lumber for her. We agreed that I would demolish the house on this basis.

5. During the week of February 24, 2008, I ran out of work for my employees so I sent them to the old plantation house to tear it down. My employees worked several days that week, generally from around eight in the morning until around five in the afternoon during which time they removed the roof and transported the tin from the house to my property located outside Calvert, Texas. After the roof was removed my employees continued dismantling the house and as lumber was removed they pulled the nails out and stacked it inside and outside the house in piles according to the kind of lumber that was being removed.

6. The old plantation house sits on an elevated site just a few hundred feet off County Road 270 and is in plain view of the road from several vantage points. Sharon Marcus's house is just across the road and only a few hundred yards from the Plantation House. The two houses are close enough that sounds such as hammering would clearly carry from one house to the other.

7. Sometime between March 2, 2008, and March 11, 2008, Ms. Marcus drove by my home and looked at the tin. She didn't say anything about a burglary at the old plantation house or that she wanted the tin back.

8. I understand that Ms. Marcus called the sheriff's department out to the old plantation house on March 2. That was a Sunday and my crew was not working that day. The roof had been removed from the house and moved to my place in Calvert before then.

9. On March 11, 2008, I got a call from one of my workers to come to the plantation house because the sheriff was there saying that we did not have permission to tear down the house. I went there and the deputy questioned me about what was going on and I told him about my agreement with Ms. Marcus. I told him where the tin was and showed him the piles of stacked lumber which were clearly visible at that time.

10. Olle Ivy, the sheriff's deputy, asked me to go to the Sheriff's office and while there I gave him a statement and offered to take a polygraph test to prove my innocence.

11. At the time we started the demolition, there were no items of personality in the house other than a couple of old furniture items which were still inside the house when the sheriff's office came to the scene on March 11, 2008. Neither I nor my workers removed anything from the house except for the tin. Everything other than the tin was still on site on March 11, 2008.

SSL-00818

12. The tin I removed from the house is still stacked on my property. No one has ever claimed the tin or tried to remove it.

13. As a result of the claims made by all three Counter-Defendants, I have suffered significant damages. I had to retain Mr. Torrey and pay him to represent me in the criminal charges the Counter-Defendants had filed and as well in this lawsuit. I then had to retain Mr. Blanks to assist Mr. Torrey with the defense of this suit as well as the Counter-Claim which is the subject of this motion. I have missed considerable work in conjunction with the criminal charges as well as those associated with this case which has cost me significant income. I have also suffered humiliation and damage to my reputation as to those who have learned of the criminal charges brought by Counter-Defendants. This damage has hurt my ability to access property and work for various farmers and ranchers.

Further, affiant sayeth not.

Martin M. Longoria, Affiant

BEFORE ME, the undersigned authority, on this day personally appeared Martin M. Longoria, known to me to be the person whose name is subscribed to the foregoing Affidavit, who being by me first duly sworn, upon oath stated that the statements contained therein are true and correct.

SUBSCRIBED AND SWORN TO before me this 24th day of October, 2012.

NOTARY PUBLIC, STATE OF TEXAS

DONELLE J. KEEN
My Commission Expires
January 23, 2013

SSL-00819

2. Longoria's Voluntary Statement Given to Deputy Ivy
Transcribed
(PlExh8B-2)
RR10:145
Appendix2
The record also contains the Audio recording
of this statement, being PlExh8B-1

PLAINTIFF'S
EXHIBIT
9(B)(2)
PENGAD 800-631-6989

NO. 32,515

SHAMARK SMITH LIMITED ) IN THE DISTRICT COURT
PARTNERSHIP, )
)
    Plaintiff, )
) MILAM COUNTY, TEXAS
VS. )
)
)
MARTIN M. LONGORIA, )
)
    Defendant ) 20TH JUDICIAL DISTRICT
)

------------------------------------------------

TRANSCRIPTION OF AUDIO STATEMENT OF

MARTIN LONGORIA

ON

MARCH 11, 2008

------------------------------------------------

MR. OLARI: Today's date is March 11th, 2008. Current time is 11:18 a.m. We're at the Milam County Sheriff's Office in Cameron, Texas. Present is Investigator Olari of the Milam County Sheriff's Office and Mr. Martin Longoria.

EXAMINATION

BY MR. OLARI:

Q. And your birth date, Mr. Longoria?

A. 8-6-64.

Q. 8-6-64?

A. Yes, sir.

Q. Before we begin I am going to read you your Miranda rights. You're not under arrest, but that way you understand your rights.

A. Yes, sir. Yes, sir.

Q. Okay. Okay. First off, you have the right to remain silent and not make any statement at all and that any statement you make may be used against you in trial. Do you understand that?

A. Yes.

Q. Any statement you make may be used as evidence against you in court. Do you understand that?

A. Yes.

Q. You have the right to have a lawyer present to advise you prior to and during any questioning. You

understand that?

A. Yes, sir.

Q. If you are unable to employ a lawyer you have the right to have a lawyer appointed to advise you prior to and during any questioning. Do you understand that?

A. Yes.

Q. You have the right to terminate the interview at any time, and prior to and during the making of this statement you knowingly and intelligently and voluntarily waive the rights set out in this warning. Do you understand that?

A. Uh-huh.

Q. Okay. What I want you to do right now is take and initial those six spots saying that you understand each and every one of your rights.

A. Okay. Okay.

MR. OLARI: Note that Mr. Longoria is --

Q. (BY MR. OLARI) I'm -- I'm just talking.

A. Uh-huh.

MR. OLARI: Mr. Longoria is initialing.

Q. (BY MR. OLARI) Okay. Now, this is a handwritten form, but since we are doing an audio statement I am just going to write on here see attached audio statement because your handwriting isn't that good --

A. Uh-huh.

Q. -- not that good and neither is mine.

A. Right.

Q. How old are you, Mr. Longoria?

A. Forty-three.

Q. And where were you born at?

A. I was born --

Q. Well, I am sorry. What's your birth date again?

A. 8-8-64.

Q. Where were you born at?

A. In Acapulco, Mexico.

Q. What is your current address?

A. It is a P.O. Box --

Q. Now, you don't live in a P.O. Box. What's your address?

A. It's -- I think I got my glasses -- 204 West Tindall I think. Let me see. Yeah. 105 West Tindall.

Q. 105?

A. Uh-huh.

Q. West Tindall?

A. Uh-huh.

Q. Calvert?

A. Yes, sir.

Q. What is your phone number?

A. It's 979 --

Q. Uh-huh.

A. -- 364 --

Q. Uh-huh.

A. -- 2056.

Q. Okay. And how far did you get in school?

A. Well, the third grade, man.

Q. Third grade?

A. Third grade.

Q. And can you read and write the English -- and understand the English language?

A. I understand English, but I can't write. I can't write.

Q. Okay. Sign right there that the statement you are about to give me is true and correct.

A. Right here?

Q. Yes. Because normally you would be writing it out, but we are just going to do an audio statement.

A. Okay.

Q. Okay. All right. The address in question is 6209 County Road 270. That's the old Snead Plantation, correct?

A. Correct.

Q. Who owns that property?

A. That's Michelle -- Michelle Marcus in my

knowledge.

Q. Okay. Do you understand who her husband is?

A. Yes. Her husband is Paul Snead.

Q. Do you know how long they have owned that property?

A. No, sir. I don't have no idea.

Q. No? Okay. As far as you've known them you know that they have owned that property though?

A. Yes.

Q. Okay. All right. What -- what -- how long have you been going out to that property?

A. Probably for the last 12 years.

Q. Twelve years?

A. Yeah.

Q. Okay. What do you do out at that property?

A. I fix fence for him. I fix, I mean, gates. I -- I -- I fix whatever they need --

Q. Okay.

A. -- over at that ranch. I plant -- plant grass for them. I mean, I worked with him when all this -- you know, every once in a while. Not all the time, but every once in a while.

Q. Do you trap hogs out there?

A. Yeah. I trap hogs out there. Yeah. They gave me permission to trap there.

Q. How -- how -- how often do you trap hogs out there?

A. Well, that's about -- like I said, about three months out of the year.

Q. Three months out of the year?

A. Yeah.

Q. Okay. Where do you normally trap the hogs at on their property?

A. In that -- that property we are talking about and across by her house.

Q. Do you normal -- on that property there by that -- by the old house do you normally steer clear of the house and stay over by the cemetery or do you go --

A. Yeah. By the -- by the house and by the cemetery. Yeah, both there.

Q. All right. Tell me about the conversation you said you had with her about the house.

A. Oh, by the old house the first conversation I had, I had it with -- with her husband.

Q. When was that?

A. Oh, it's been -- it's -- it's been probably -- I don't know. It's been a while. I don't know how long I could use, but it's probably been, I don't know, six months ago, seven months ago.

Q. Uh-huh.

A. But about two -- about three weeks ago -- two weeks ago I went to Mrs. -- her house, Mrs. Marcus' house, and I ask her, I said, "Mrs. Mar -- Mrs. Marcus what's you going to do with the -- with the old houses you got out there?" And she said, "Nothing. I am going to doze it down."

I said, "Ma'am" -- I said, "Ma'am, well, if you going to doze it down, you know, why don't you let me take it apart, and I -- you know, maybe we can save some -- some" -- and she said -- before I say anything, she said -- before I make any deal with her she said, "Well, look. This is what I'll do. You just take the tin and you -- and let me keep the lumber."

Q. She said this to you?

A. Yeah. She said that to me. It was an agreement --

Q. Uh-huh.

A. -- that we had. So, you know, I pursued doing that. When I didn't have nothing for the boys to do I told them, you know, "Just go ahead and start taking the tin off, and the lumber leave it right there because it belongs to" --

Q. When did she tell -- when did she tell you that you can take the house apart, just give her the lumber?

A. That's been about -- like I said about -- I

don't remember exactly, but it was about -- it was about two weeks ago.

Q. Two weeks ago?

A. Yeah.

Q. How long after she told you that did you start taking the house down?

A. Probably about -- about three days later.

Q. Three days later?

A. Yeah.

Q. Okay. Did -- did you actually take any of the house down yourself or did you just hire people to do it for you?

A. No. I just -- sometimes I do, but most of the time, you know, I get those boys to do it.

Q. Okay. Those boys all work for you, right?

A. Yeah. They work for me.

Q. You -- you direct their actions?

A. Yes. Yes.

Q. Okay. And you tell them what to do?

A. Yes.

Q. Okay. How much do you pay those boys?

A. Eight dollars an hour.

Q. Eight dollars an hour?

A. Right.

Q. Each one of them?

A. Right.

Q. Okay. Have you gotten any money out of that house yet?

A. No.

Q. No?

A. No, nothing.

Q. Okay. What all did you take off that house?

A. Just the tin.

Q. Just the tin?

A. Just the tin. The -- the lumber that we take -- took out, we left it right there.

Q. You left right it?

A. Right beside it. We didn't take nothing else.

Q. Okay. What about the -- the moldings and --

A. No. No. No, nothing like that. No. We didn't take no doors. We didn't take no moldings. We didn't take nothing but the tin. That's all we took.

Q. Okay. All right.

A. And, you know, if you go inside and look at the house, I mean, you can see what is fresh and what is old, you know --

Q. Yeah.

A. -- if you know --

Q. Wait. Wait. Had you been in the house before you started tearing it down?

A. Oh, yeah. Yeah.

Q. Was the molding still there?

A. Part of it was still there. Some --

Q. Part of it?

A. -- of it was -- is rotten out and -- and, you know.

Q. Uh-huh.

A. So I don't -- I don't know how much it -- it was still there because I didn't pay no attention, you know. I just -- you know, but I know some is there, but like I said, if you -- if you look at the house you -- you know, you can see what is fresh and what is, you know --

Q. Yeah.

A. -- been take off. But it is the agreement that we have and I didn't know she was going to change her mind, and the reason why I didn't know and the reason why I didn't know she change her mind, okay, because she's -- last week, you know, she went by my -- by where -- by my -- by where I got my -- my company because my -- the ranch, and she look at the tin, you know, and she didn't say nothing.

She didn't say -- I met her and -- I met her in Calvert. She wave at me. Her and Mr. Lonnie Dodge went over there and look at the tin, but they

didn't say nothing. She didn't say -- he didn't tell me nothing. He didn't say nothing. I wasn't there, but I met him and I didn't know. I didn't know she was going to change her mind.

Q. Okay. So to the best of your knowledge she told you you could take the tin off the house?

A. Yes. Yes.

Q. Okay.

A. But --

Q. But you didn't touch any of the doors --

A. No.

Q. -- or tile or --

A. No.

Q. -- anything like that?

A. None of that. None of that.

Q. Think any of your guys took it?

A. No. No. No. No. No. No.

Q. Did you see them when they brought the stuff back?

A. Yeah. I saw them when they bought -- when they brought the stuff back.

Q. All they had was the tin?

A. All they had was the tin.

Q. Where is the tin at now?

A. It's over at the ranch. It's over there where

I got those -- where I -- by the gin.

Q. In --

A. By the gin.

Q. In Calvert?

A. In Calvert.

Q. Okay.

A. I've got more -- more -- I have got some doors over there that -- that took off in the -- another house.

Q. Another house?

A. Yeah, another house. But that house we didn't take nothing. I mean, if she can -- she can go out there and recognize a door knob or whatever, she needs to tell it to me because --

Q. Well, did you watch them, physically watch them, bring that stuff back?

A. I watch because I was there when they got there with the tin.

Q. And you're going to sit there and tell me that they didn't have anything on that truck?

A. They didn't have anything.

Q. Besides --

A. I swear --

Q. -- tin?

A. I swear to you and I swear to God.

Q. Then how would they -- what's the possible --
then what's the possibility of some of their -- her
doors being at your place?

A. None.

Q. None?

A. No. I -- I swear none because if -- if those
boys would --

Q. Okay.

A. -- or -- or -- or I would have take that, I
would have said, "Yes. Look, this is what I took." But
no. I am telling you the truth. All I took is the tin.
So if she come out with all of that, that's -- I don't
know why.

Q. Okay. So --

A. But that's -- I mean -- I mean, I don't -- I
don't --

Q. So let me ask you this. If the DA says, "Well,
we don't know who to believe and they ask you to take a
polygraph," would you pass the polygraph?

A. I -- I will take it, yeah. I will take it.

Q. Okay. Well, I'm not saying she's going to.
I'm just saying --

A. Yeah.

Q. -- if she did.

A. Yeah. I mean, but she need to take one too,

wouldn't you think?

Q. Well, that's -- that's -- like I said, I am just throwing that out there.

A. Yeah.

Q. I don't know if that's what that DA is going to say.

A. Yeah.

Q. Anyway, so you are -- are you saying that the only thing that you took was what you was told you could take?

A. Yes, sir. Yes, sir.

Q. Okay.

A. The only thing -- that's why today those boys didn't take no trailers, didn't pick nothing up because I said, "Leave everything there." I said, "Pull the nails out and stack it neat and leave it there -- right there."

Q. Okay. All right. All right. So that -- that's it then. You have still got the -- you have still got --

A. Yeah.

Q. -- all the material you took?

A. Yeah. It's still there where she saw it.

MR. OLARI: Okay. All right. All right. The current time is 11:29 p.m. End of statement.

THE STATE OF TEXAS )

COUNTY OF BEXAR )

I, DEBORAH A.G. DAVIDSON, a Certified Shorthand Reporter in and for the State of Texas and Registered Professional Reporter, do hereby certify that the foregoing transcript was transcribed from a CD furnished to me by the Law Offices of Israel Garcia through hand delivery; that the CD was transcribed truthfully and accurately, to the best of my ability, and completed on July 7, 2014;

WITNESS MY HAND, this the 7th day of July, A.D. 2014.

_____
Deborah A.G. Davidson, Texas CSR
Expiration Date: 12/31/15
Firm Registration No. 253
Davidson Reporting, Inc.
926 Chulie Drive
San Antonio, Texas 78216
Phone: (210) 340-3656

3. Marcus' Handwritten Statement
PlExh6B
RR10:134
Appendix3



PLAINTIFF'S
EXHIBIT
6B

PENGAD 800-631-6989

**Milam County Sheriff's Department**
Cameron, Texas

3/11/08

COP

**VOLUNTARY STATEMENT**
(Not Under Arrest)

Name: Sheron Moreus Smith          DOB: 12/7/58  DL: Tx 08115671

Address: 2896 FM 2027          City: Cameron  State/ZIP: Tx 76520

Phone: (979) 364-2161          Alt. Phone: (915) 492-1260

*I understand my rights and knowing what they are, I freely and voluntarily, without being forced or compelled by promises, threats, or persuasion, and without promise of enumeration or award, make the following state-ment in writing:*
This statement was taken this __11th__ day of __March__, 20 _08_ by _Sheron Moreus Smith_

at _2896 FM 2027 76520 - 979-364-2161_

**STATEMENT**

Marten Longoria came to my home on FM 2027 to ask me what I wanted to do with my house across the road on CR 270. I told him that I was going to leave it alone for now. Some days I want to Restore this house + sometimes I don't. I would let him know if I wanted to do anything with the house. Marten has trapped hogs on my land before and has done some fence work for me in the past. I NEVER told Marten to tear down my old Farm House. Paul + Joshua Smith came across to get some grain from my grain bin on Sunday before last as Paul called me @ home and asked me who I gave permission to to tear down the old Farm House. I told him I did not give anyone permission + he told he to get over here someone has burglarized + taken the roof off of the Old Farm House I came across the Road from my house + took @ the old House, went into shock + called the sheriffs Dept. Deputy Day came out + took a Report. today I was going down FM 2027 to 975 + saw a white truck full of hispanics coming towards CR 270 - I turned around, followed them - they turned into my 270 gate - onto my property + I blocked them in the property + called the sheriffs Dept to come out + arrest them. Deputy Day + Sheriff West came out.

Witness

Page __1__ of __6__

DEF-00019

Signature of Person Giving Statement

_Sheron Moreus Smith_
Printed Name of Person Giving Statement

4. Marcus' Typed Statement
(differs from handwritten statement)
PlExh6A
RR10:132
Appendix4



PLAINTIFF'S
EXHIBIT
6A

PENGAD 800-631-6989

March 11, 2008

Statement of Sharon Marcus Smith

On approximately March 2nd or 3rd (it was a Sunday), 2008, I was home and received a phone call from my husband, Paul J. Smith. Paul and Joshua Smith were across the road (on headquarters) getting some grain from the grain bin for their hog/deer feeders. He asked me who was tearing down the old farmhouse located at 6209 CR 270, Cameron, Milam County, Texas. I told him I did not know and he told me to come over there. I went across the road to the old farmhouse only to find that it had been destroyed/dismantled and/or burglarized. I went into shock and called the Milam County Sheriffs Department to send a Deputy out.

Deputy Ivy came out and took the report.

I deeded the property to the ShaMark Smith Limited Partnership on or around August 11, 2004. The ShaMark Smith LP is managed by ShaMark Smith Management Co., LLC whose general manager and owner is Paul J. Smith.

When I owned the property (prior to August 11, 2004,I had given Martine Longoria permission to trap hogs on my place and that is all. Later I told him to take his traps off my place because my calves were getting caught in his traps. Martine Longoria did not have permission to do anything else.

A copy of the above referenced Deed was provided to the Milam County Sheriffs office. I used the old farmhouse to store various things.

Since the burglary, the farm house is missing a metal roof, two old chandeliers, antique doors with the original hardware, architectural molding, fireplace irons (antique), an old stereo, two antique chest of drawers that Mrs. Lomax left in the home when she sold it to dad, a couple of old lamps, some old stained glass which used to be a part of the old Sneed Chapel which was located in the Cemetery years ago. Lumber has also been stolen from the house and there was an old mirror. Copper pipes, a breaker box (200 amp) with circuit breakers in box, windows, etc... There may be various other items that I have forgotten about at this moment.

On March 11, 2008, I was traveling down FM 2027 toward FM979 to go to Bryan, Texas when I noticed that a white truck with several Hispanic males in the truck traveling down FM 2027 toward CR 270. I turned around and followed them. They turned left onto CR 270 and proceeded to open the gates and enter into headquarters where the old farmhouse is located. I pulled up and blocked the gates so they could not exit through the gates. I called the Milam County Sheriffs office and reported that they were back and I stayed on the line until the Deputy arrived. Sheriff West came out later.

I discovered that Martene's men would drop a crew off at the old farmhouse and the truck would then leave the premises.

I pass headquarters on a daily basis to check my cattle, etc... and I never saw a truck nor a trailor around the farmhouse before Paul discovered that the roof was gone. It was not until Paul and Joshua discovered the roof to be missing that we discovered that the old farmhouse had been burglarized. As a result of the burglary, we have placed a reward add in the Milam County Herald, the Rockdale Reporter, the Calvert paper, the Hearne Democrat, the Franklin Paper and the Bryan Thrifty Nickel. The add offered a

SSL-00051

substantial reward for any information leading to the arrest and conviction of anyone connected with the burglary of the old farmhouse.

SSL-00052

5. List of Property Values Submitted to Sheriff
PlEx24
RR11:53
Appendix5

Burglary loss of March 2, 2008    *Sha Mark Smith L.P.*

9 antique doors            $1,200.00 each  10,800.00
18 antique trim            $ 800.00 each   14,400.00
9 antique brass door knobs $ 250.00 each   2,250.00
1 large antique mirror     $2,500.00
roof                       $3,500.00
antique lumber             $45,000.00
copper pipes                3,500.00
breaker box                $ 900.00
wire                       $3,500.00
windows                    $5,500.00
breakers                   $ 750.00
antique furniture          $ 3000 ⁰⁰

clean up                   $10,000.00

total:                     $~~100,600.00~~
                           103 600 ⁰⁰

*Supplemental list of lost/stolen
                    items*

*thank you*

*Paul J Ste*

713 221 2413
254 697 2996
979 364 2161


PENGAD 800-631-6989
PLAINTIFF'S
EXHIBIT
24

197

6. Deputy Ivy's Investigative Report
PlExh7A
RR10:135
Appendix6



EXHIBIT
7(a)

**Milam County Sheriff's Office**
**Sheriff Charlie West**
512 North Jefferson Cameron Texas – 76520
254-697-7033, 254-697-7063 (Fax)

Date of Offense: March 02, 2008

Case No.: 0803-0949

## INVESTIGATION NARRATIVE

On March 2, 2008 at about 4:00pm I Investigator Oly Ivy was dispatched to 6209 CR 270 in reference to a burglary. When I arrived at the location, I observed that it was an abandoned farm house that sat on a large acreage tract with out buildings. The property is on CR 270 near the Baileyville Community. As I entered the driveway and drove the distance from the County Road to the residence I observed that the roof of the abandoned farmhouse was missing. I pulled my patrol car next to the victim's car and exited. I met with the victim, Sharon Marcus and her husband Paul Smith. I was told that the property had belonged to Ms. Marcus' father and upon his death about 10 years ago she and Paul Smith bought the property under the name of SHAMARK SMITH LP. They have retained the property since that date. She added that they had paid to have a tin roof placed on the home about 10 years ago also. I inquired if the home was livable and she stated no. She stated that she had planned to renovate the farm house and make it into a historic landmark farmhouse for show purposes. I observed that there were pieces of wood lying on the ground outside the residence. It was neatly stacked. I was told that it had been removed from inside the residence and that the suspects had done that. I entered the home and observed that there were other pieces of wood neatly stacked as well as windows and doors that had been removed. The ceiling was missing and I could see the sky from the interior of the building. As I walked around, I was informed that the more valuable interior door moldings had been removed. They were described to me as "architectural" moldings. The lesser value moldings were still in place. I walked outside and observed that on the north side of the building, which is the rear, that the suspects had used wood from the buildings roof to make a ladder that gave them access to the roof. I asked how they would have gotten to the roof initially, and was told that when Paul Smith arrived this afternoon, one of the ladders from the out building was lying next to the abandoned farm house. He had placed it back in the out building prior to my arrival. I observed numerous pieces of wood lying on the ground. I was told that was the wood roofing that the tin had been attached to. I was further told that the only reason for the suspects to have removed the slat wood would be to get at the valuable wood of the "A" frames, which were still present. I walked completely around the farm house and observed a piece of tin lying on the ground on the northwest corner of the building. I lifted the tin up and observed that the grass was lying down and had begun to turn yellow. This indicated that the tin had been lying there for some time. I walked around to the front of the farm house and observed another piece of tin lying on the ground. I lifted it up and observed that the grass had nto begun to turn yellow, indicating that this piece of tin hadn't been there that long. I retrieved my digital camera and took numerous photographs of the farmhouse, inside and out. While walking around I located a long pry bar lying in the grass. I was told that it didn't belong to the owners, so it had been left behind by the suspects. I placed it in my patrol cars trunk as evidence. While walking around, we also discovered that the exterior fuse box and wiring had been removed.

I inquired as to when this offense had occurred. I was told by Mr. Smith that he had driven by around 2pm and he didn't notice anything wrong. He stated that when he drove back by around 4pm he noticed the front part of the tin roof was missing. That caused him to investigate and subsequently call the Sheriff's Office. I asked if they had heard or seen anything in the area that day. I was told that the neighbors heard hammering on Saturday morning and also heard it on Tuesday and Wednesday during the afternoon that week prior. is indicated that the materials were removed during a week time span and was done during the daylight hours.



PLAINTIFF'S
EXHIBIT
7A
PENGAD 800-631-6989

DEF-00007

I asked Mrs. Smith to provide me with a deed showing ownership over the property, she stated that she would provide it. I asked for the value of the items taken, and I was told that they were unsure at that time. I asked them to provide me with a list of the items taken and their values. I then left the property to assist Cameron PD with a pursuit in progress.

When I arrived for work on March 5, 2008 I found a letter from Sharon Smith in my box. It lists the items stolen as follows: (9) Antique Doors-$10,800; (18) Antique Trim $14,400; (9) Antique Brass door knobs $2250; (1) Antique Mirror $2500; Tin roof $3500; Antique lumber $45000; copper pipes $3500; breaker box $900; wire $3500; windows $5500; breakers $750; Antique furniture $3000. The list shows a value of $10000 fro clean up, but that number will nto be added to this report for value lost. The total value of stolen property as stated to this investigator is $93,600. Investigation continues.

## SUPPLEMENTAL NARRATIVE:

On March 11, 2008 I Investigator Oly Ivy was dispatched to 6209 CR 270 due to that fact that Mrs. Marcus had called and stated that the suspects who had stolen the items from the farmhouse had returned. She stated that she had blocked the gate so that they could nto exit. She added that there were many of them and that they had arrived in a single pickup. I left the Sheriff's Office and went en route, with Sheriff West right behind me. When I arrived, I observed that Mrs. Marcus had her white Dodge P/U parked in front of the gate. She moved her truck up so that I could have access to the gate. She stated that they are Hispanic and do not speak English. She added that her neighbor had arrived to translate. I had him ride with me up to the house.

At the abandoned farm house, I observed that there were seven Hispanic males walking around the house. I ordered them all to stand in front of me with their hands up. There I asked them all for ID. None had any so I took their names and birthdates with the assistance of the translator. Identified were: Ismael Castro 05/22/74, Armando Flores 08/14/1966, Paul Marcos 05/09/1970, Luis Marco 08/12/1983, Hilario Longoria 01/14/1970, Jose Fernandez 07/08/1984, John Flores 07/26/68. All were employees of Martin Longoria of Calvert, Texas who employed them at $8 per hour each. They had been instructed to drive here and continue dismantling the house. I asked if any of them had been there before to remove material from the structure and all raised their hands. Sheriff West arrived and we spoke for a minute. He left and returned to the gate to speak with Mrs. Marcus.

At that time, Martin Longoria arrived. I asked him if these men worked for him and he stated yes. He stated that a couple weeks ago, Sharon Marcus told him he could have his men dismantle the abandoned farmhouse and he could take the tin as long as he gave her the antique wood. He stated that he removed the tin and neatly placed the de-nailed wood for her. I remembered seeing the wood neatly stacked when I took the initial report on 03/02/08. I asked Mr. Longoria where the tin was now. He stated that it was at his workshop in Calvert, Texas. He added that Sharon Marcus had even driven by there this past week and spoken to him and didn't say anything to him about it. I asked Mr. Longoria to give me a written statement, and I provided him with a MCSO statement form and a writing pen. After he completed the statement, he handed it back to me and stated that he had to write it in Spanish. I had been recording everything using the in car audio video, so I had him read to me what the statement said. It stated that they had an agreement for him to take the materials off the house. I ran all of the men through dispatch and made sure none were wanted. After doing so, I ordered them all off the property at the owner's request. I informed Martin Longoria that I needed him to follow me to the Milam County Sheriff's Office for further questioning and he agreed.

I returned to the entrance gate and met with Sheriff West and Mrs. Marcus. There Sheriff West had taken a written statement from Mrs. Marcus that stated that she had nto given Longoria permission to remove material from the farmhouse. Sheriff West informed Mrs. Marcus that we would consult the Milam County District Attorney before we took any action. I returned to the Sheriff's Office with Mr. Longoria following me.

DEF-00008

When we arrived, I had him it in my office with the door open. There I contacted the DA's office and spoke with Milam County DA Kerry Spears. After briefing her on the case, she instructed me nto to make an arrest at that time, to compile all the facts and forward the case to her for review. After ending the phone call, I informed Mr. Longoria that I needed to get a good statement from him. He agreed to provide me with one. I informed him that due to his poor handwriting, I would like to take an audio recorded statement from him. He agreed to do so. I began my digital audio recorder and read Mr. Longoria his constitutional rights from a preprinted form. After I was sure that he understood each and every one of his rights, I had him sign the rights form. I then proceeded to question him about the manner in which the house was dismantled. He provided a audio statement that detailed the manner in which he knew Mrs. Marcus and how the house was dismantled. After I ended the statement, I informed him that the case would be forwarded to the DA's office for review. He then left the MCSO. At this time, it is unclear who is being truthful and there is no clear evidence of a criminal offense. Case closed and forwarded to the Milam County District Attorneys Office for review.


Oly Ivy
Criminal Investigator
Milam County Sheriff's Office

DEF-00009

**Supplemental Narrative:**

On March 17, 2008 I was given a written memo from Milam County District Attorney Kerry Spears stating that she requested that I obtain an arrest warrant for Martin Longoria for this regarding this case. I contacted Mrs. Spears via telephone and spoke with her about this. I confirmed that she wanted to base the value of the theft based on the amount provided to me by the victims in this case. Ths itemized list that was provided to me stated that the total amount of value of stolen materials is $93,600. That makes this a 3rd Degree Felony Theft of Property. I have completed a Probable Cause affidavit/complaint and will obtain an arrest warrant on 03/25/2008

Oly Ivy Criminal Investigator
Milam County Sheriff's Office

DEF-00010

**Supplemental Narrative:**

On March 25, 2008 I Investigator Oly Ivy completed a probable cause affidavit charging Martin Longoria with Theft of Property $20,000 to $100,000 a third degree felony. I presented the affidavit to Justice of the Peace Pct. 1 Judge Dunsmoor, and obtained a warrant for Martin Longoria's arrest. I contacted Mr. Longoria via telephone and informed him of the warrant. He turned himself in voluntarily to the Milam County Jail the same day without incident.

Oly Ivy
Criminal Investigator
Milam County Sheriff's Office

DEF-00011

7. Deputy Ivy's Probable Cause Affidavit
PlExh7B
RR10:140
Appendix7



PLAINTIFF'S
EXHIBIT
7B

PENGAD 800-631-6989

F08-00125

COPY

## Milam County Sheriff's Department
## PROBABLE CAUSE STATEMENT

### Cause No. 0803-0949

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS

Personally appeared before me this Affiant, who after being by me duly sworn deposed and says your Affiant has good reason to believe and does believe that one: **Martin Longoria W/M 08/08/1964**, hereinafter styled Defendant, heretofore on or about the 2nd day of March 2008 in the County of Milam and State of Texas did then and there intentionally, knowingly, unlawfully appropriate, by acquiring or otherwise exercising control over, property to-wit: building materials, household molding, furniture from abandoned residence valued at $93,600, of the value of $20,000-$100,000, from ShaMark Smith Lp, the owner thereof, with intent to deprive the owner of the property.

### Theft of Property
### $20,000-$100,000 PC 31.03 (a) (2)
### Felony 3rd Degree

AFFIANT'S BELIEF IS BASED ON THE FOLLOWING FACTS:

1. Affiant is a licensed Peace Officer certified by the State Of Texas.
2. Affiant is currently employed by the Milam County Sheriff's Office as a Criminal Investigator
3. Affiant was acting as so on March 2, 2008 when he was dispatched to 6209 Cr 270 Milam County Texas in reference to a burglary
4. Affiant arrived and met with victims, Sharon Marcus and Paul Smith. Affiant was told that they as a partnership, ShaMark Smith Lp, owned the property. On the property was the "Old Sneed Plantation" home. The home is abandoned, and in poor shape. Affiant took offense report from victims stating that that house had been basically dismantled by an unknown subject(s) and the materials removed. They stated that the tin roof, wood from the roof and interior as well as door and window molding, windows, doors and other building materials were removed from the house without permission.
5. Affiant took digital photographs of the crime scene.
6. On March 11th 2008 affiant, along with Sheriff Charlie West, was dispatched back to 6209 CR 270 due to the fact that the victim, Sharon Marcus, had found a group of Hispanic males at that location without permission to be there. She had used her vehicle to blovk there exit until our arrival.
7. Affiant arrived and located seven Hispanic males, none spoke very good English. A neighbor of Mrs. Marcus translated for the affiant. Affiant was told that the 7 men worked for a Martin Longoria. He had brought them to this location about 2 weeks ago and told them to start dismantling it. On this date, he had told them to use of his work trucks to come to this location and continue dismantling the house. I asked the men who Martin Longoria was, and was told that he is their employer and he provides them a place to live. He lives in Calvert, Texas. I had one of the men contact Mr. Longoria, who came to our location.
8. Affiant spoke with Martin Longoria who stated that he knows Sharon Marcus and he is allowed on the property to trap hogs. He stated that a few weeks ago, she had given him permission to dismantle the house, as she wanted the antique wood. Affiant then spoek with victim Sharon Marcus who stated she had not given Martin Longoria permission to dismantle the house. Affiant recorded names of the 7 men working for Martin Longoria, then instructed Longoria to follow affiant to the Milam County Sheriff's Office for further questioning.
9. At the Milam County Sheriff's Office, affiant read Martin Longoria his constitutional rights, and after Longoria waived his rights, began to question Longoria. Longoria stated that he was given permission to dismantle the home, and admitted that he had ordered his employees to dismantle the house for him. He also admitted that some of the building materials were being stored at his yard in Calvert, Texas. Affiant recorded the interview using a digital voice recorder.
10. Affiant was given a written list itemizing the amount of loss for the materials by the victim in this case. The list totals the value of the property stolen from the house at $93,600

COPY

11. Affiant completed case file and forwarded it the Milam County District Attor... y Spears for review. On March 17th 2008 affiant was given a written memo by D... s requesting affiant obtain an arrest warrant for Martin Longoria. Affiant contacted s and confirmed that the value of the theft was to be based on the itemized list pro :o the affiant by Mr. Paul Smith and Sharon Marcus the victims.

12. Affiant prays for issuance of warrant for arrest for Martin Longoria, as he has ........ed Texas Penal Code 31.03 Theft of Property of the value of $93,600 which m.. .. ..is offense a Felony of the 3rd Degree.

I do swear and affirm that the statements, facts and representations that I am si... .. ə the truth, So Help Me God."

AGAINST THE PEACE AND DIGNITY OF THE STATE

Affiant

Subscribed and sworn to before me this \_\_\_ day of \_\_\_\_, A.D., 20c8

HELEN REYES
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 01-16-2009

Notary public/ Peace Officer/ Magistrate
(Pursuant to sec. 602.002, Texas Government C ·dc

Subscribed and sworn to before me this \_\_\_\_day of_____, A.D., 200\_\_\_\_.
I certify the affidavit has been properly sworn to and executed, and that there is prob...ble ( . issuance of process.

Justice Of The Peace Precinct    Milam County, T ·xa

COPY

DEF-00027

8. Smith's Grand Jury Submission (Direct File)
PlExh29
RR11:70
Appendix8

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT 29

# SHAMARK SMITH LP
1601 S. Shepherd # 161
Houston, Texas 77019
(713) 271-2413

To the Foreman and Honorable Members of the Milam County, Texas Grand Jury:

My business name is ShaMark Smith, LP. I am a Texas registered limited partnership. I am represented by Paul J. Smith, Attorney at Law, 117 N. Houston Avenue, Cameron, Texas 76520, (254) 697-2996.

I am presenting a case for direct file for theft of over $100,000.00 and under $200,000.00, {Texas Penal Code, Section 31.03 (6)} of building material and personal items stolen directly from my property in Milam County, Texas, known as the "Old Sneed Plantation" by Martin Longoria, DOB 8/8/1964; who is not a United States citizen. Martin Longoria's previous criminal history includes attempted murder for which he received 5 years deferred probation and a protective order for severely beating his spouse.

ShaMark Smith LP was formed in August 2004, when Sharon D. Marcus, 2896 FM 2027, Cameron, Texas 76520 created the entity ShaMark Smith LP, by deeding real estate and personal property to this Texas limited partnership. ShaMark Smith LP is managed by ShaMark Smith Management Company, LLC., whose owner and general manager is Paul J. Smith and ShaMark Smith LP's daily operations are run by Paul J. Smith, general manager.

The property location the theft occurred is 6209 CR 270, Cameron, Milam County, Texas, known as the "Old Sneed Plantation". The entrance to the "Old Sneed Plantation" can not be locked as it is a cemetery road and the cemetery association has an easement on the property. All of our other properties are locked.

In or around 1996, this particular tract of land containing the "Old Sneed Plantation" home was acquired and plans were made to restore it and turn it into a bed and breakfast. In 2004, after the property was deeded into the limited partnership, serious plans were undertaken to restore the "Old Sneed Plantation" and efforts were begun to refurbish the "Old Sneed Plantation" to its original condition. The original plantation has a cotton gin on it and we had begun efforts to scrape the outside of the old house to paint it so that we could begin restore the interior. The entire cost of restoration was estimated to be around $40,000.00 - $70,000.00. Sufficient monies were placed into the ShaMark Smith LP account to begin the project. The house that was burglarized was over 110 years old and was in excellent interior shape. It had immaculate hardwoods and exquisite antique doors and molding along with the original chandeliers and hardware for the doors and cabinets. Additionally, we stored some of the original antique furniture and memorabilia there, along with other antique items original to the house and time period. The house had not been disturbed in over 110 years and in 1987 it had been restored once before with new electrical and plumbing. It is my estimate with the earlier restoration work done to the "Old Sneed Plantation", it was worth well over $100,000.00 prior to its destruction by Martin Longoria.

SSL-00001

# SHAMARK SMITH LP

On Sunday, March 3, 2008, I drove one of my workers to town and he and I drove by the "Old Sneed Plantation" at approximately 1:30 P.M. and the roof was on the "Old Sneed Plantation". When I went over to get corn at about 4:30 P.M. the roof to the "Old Sneed Plantation" had been removed. I immediately called my wife and asked her who she had tear down the "Old Sneed Plantation" and she said no one. She called the sheriff's office and investigator Ivy came out. We were in shock. The whole building was destroyed and all of our plans to restore the "Old Sneed Plantation" into a bed and breakfast are now gone.

We then placed ads in the following newspapers on the following dates:

Cameron Herald on March 6, 2008 and March 13, 2008,
Rockdale Reporter on March 6, 2008,
Hearne Democrat on March 12, 2008,
Calvert Tribune on March 12, 2008,
The Franklin Advocate on March 12, 2008, and
Thrifty Nickel on March 13, 2008;

offering a substantial reward for the arrest and conviction of persons responsible for the theft of the roof, lumber and other antique items from the site.

All of the electrical wiring, breaker boxes, cooper pipes, tin roof, antique lumber, antiques, molding, antique doors and hardwoods have been stolen and the "Old Sneed Plantation" was a total loss. We drive by this property on a daily basis to see if everything is okay and every day we drove by it was. Every time we drove by there was no trailer there, nor were there any trucks there, or we would have stopped and investigated..

On March 11, 2008, my wife was driving to town and noticed a truck load of Hispanic males traveling down FM 2027. She turned around and followed them. They went into the "Old Sneed Plantation" and my wife blocked the gates so they could not exit. She then called the sheriff's department. Investigator Ivy came out. We then discovered that Martin Longoria had one of his workers drop off a crew of illegals and then leave the premises.

What is interesting is that after the sheriff arrived that day, he let them go after one of the workers called Martin Longoria. Martin Longoria came to the "Old Sneed Plantation" and said he had permission to tear down the house. The sheriff let him go home without charging him with a crime. However, I believe he has the names of the illegals.

**AT NO TIME DID MARTIN LONGORIA HAVE PERMISSION TO DISMANTLE SHAMARK SMITH LP's PROPERTY, NOR DID SHARON MARCUS GIVE MARTIN LONGORIA PERMISSION TO DO SO.**

# SHAMARK SMITH LP

I, as general manager, am the **ONLY** one who can give permission to alter, work-on or tear down any of the ShaMark Smith LP property and I NEVER gave Martin Longoria permission to tear down the "Old Sneed Plantation".

When my wife and I first met Martin Longoria and before my wife deeded the land to ShaMark Smith, LP, my wife had given him permission to trap hogs on parcels of land that we own. After she deeded the land to ShaMark Smith, LP, I told Martin Longoria to get his hog traps off of our land as they were catching our calves, and not come back.

Other neighbors of ours have had problems with Martin Longoria. He has stolen diesel from 2 of our neighbors and taken fencing materials from another one. They are afraid of reprisal by him. Martin Longoria had dismantled a house for Bo Lutz earlier, but we NEVER gave him permission to dismantle ours.

We are requesting that you indict Martin Longoria for theft of property over $100,000.00 but under $200,000.00, Texas Penal Code, Section 31.03 (6). Also, please look at Section 31.10, Actor's interest in property, ShaMark Smith, LP had the exclusive right of possession of the property.

I have included the following exhibits for your review:

1. Deed to ShaMark Smith LP
2. Picture of Cemetery entrance
3. Picture of other locked entrance on one of the other parcels of land owned by ShaMark Smith LP
4. Pictures of "Old Sneed Plantation", before theft by Martin Longoria
5. Pictures of evidence of theft and destruction to the "Old Sneed Plantation" by Martin Longoria
6. Ads placed in newspapers
7. Statement given by Sharon Marcus
8. Criminal history and plea of Martin Longoria for Attempted Murder
9. Statement of Martin Longoria in the attempted murder
10. Protective Order application filed against Martin Longoria
11. Original Suit Affecting Parent Child Relationship for Martin Longoria
12. Paternity Testing Order for Martin Longoria
13. Offense report and statements involving Martin Longoria' Attempted Murder case

Should you have any questions, we are available to testify.

Thank you;

Paul J. Smith
General Manager, ShaMark Smith LP

9. Grand Jury No Bill
DefExh1
RR12:137
Appendix9

CAUSE NUMBER _____

## NO BILL

THE STATE OF TEXAS      §     IN THE DISTRICT COURT OF

VS.      §     MILAM COUNTY, TEXAS

*Martin Longoria*     §     20TH JUDICIAL DISTRICT

TO THE HONORABLE JUDGE OF SAID COURT:

We, the Grand Jury for the _September_ term A.D., 20_08_, of the 20th Judicial District Court wish to report that we have inquired carefully into the case against the above named defendant, *Martin Longoria*, and in this said complaint we have voted a NO BILL".

DATE: _20 Nov 08_

_____
FOREMAN OF THE GRAND JURY

### ORDER OF THE COURT

It is hereby ordered that the minutes of the 20th Judicial District Court, of Milam County, Texas reflect that _Martin Longoria_ has been "NO BILLED" by the Grand Jury.

The Sheriff of Milam County, Texas is directed to release the said defendant if he is in custody unless he is being held in other matters not covered by this complaint.

Signed this __21__ day of __Nov__, 20_08_.

_____
Judge, District Court
20th Judicial District
Milam County, Texas

RECEIVED
NOV 2 1 2008
BY:_____

181

10. Notice of Insurance Claim Reported 3/3/2008
DefExh1
RR12:14
Appendix10

REINSURANCE CATEGORY 3 OR HIGHER            SEVERITY: 2 INTERIOR DAMAGE:

POL #: 913865          EFF DATE: 11/15/2007    PREV CLMS:  1    CLAIM #: 780622

MBR #: C44H   WRT CTY: 166   LOC CTY: 166   AGT: 28257   REIN: L   D/A: 03/02/2008

POL STATUS: 2  TYPE: FRO    FRM-A4  UND   K          SUPV: 15   TERM EFF: 11/15/2007

INSD: PAUL SMITH                     2ND INSD: SHARON MARCUS-SMITH
ADDRESS: 2896 FM 2027                    CITY: CAMERON
ST: TX  ZIP: 76520-5100  PH (H): (979) 364-2161  (W): (713) 271-2413 EXT:
        (CELL): (    )    -        EMAIL:

MORTGAGEE NAME:
ADDRESS:                             CITY:
ST:      ZIP:           ROOF YR: 0000  TYPE: COMPOSITION          CLASS:
PURCHASE PRICE:         TTL SQ FEET:  3,000  SQ FT HEATED/COOLED:  2,700
LOCATION OF PROPERTY: 20.0 MI NE OF CAMERON ON FM 2027
     LAT/LONG:                        GRID #:
D/LOSS: 03/02/2008  TIME: 04:30PM  POLICE RPT: YES    TWIA POL#
CASE #:                             AGENCY: MILAM COUNTY SHERIFF

ACCIDENT LOCATION:
ACC CITY:                            CTY:                    ST:

ACCIDENT DESCRIPTION: THERE WAS A THIEF OF THE INSURED PROPERT       Y VA
CANT HOME ON THE PROPERTY HAD THE METAL ROOF STOLEN INTERIOR WALLS, TRIM A ND
 DOORS ELECTRICAL BOX WAS STOLEN SOME FURNITURE STOLEN

ADDITIONAL INFO:

REP BY: PAUL SMITH              IND: I  DATE: 03/03/2008  PH: (979) 364-2161

REPORTED TO: L CSR0384

DED 1:   500 (WINDSTORM, HURRICANE, HAIL)   DED 2:   500 (ALL OTHER PERILS)

CAUSE: T  SUB-CAUSE:    ASSIGN TO: 8461    ASSIST:

| ITEM | COVG | LIMIT | DED | RESERVE | DESCRIPTION OF PROPERTY |
|------|------|-------|-----|---------|-------------------------|
|      | MDWG | 300000 |    |         | MAIN DWELLING |
|      | MHHG | 300000 |    |         | MAIN DWELLING HOUSEHOLD GOODS |
|      | 9040 | 1 |         |         | REPLACEMENT COST CONTENTS FORM-A POLS |
|      | 954A | 1 |         |         | REPLC COST MDWG,ADDL PERILS,LTD MOLD |

1

11. Smith's Sworn Proof of Loss Submitted to Insurance Company
PlExh25
RR11:54
Appendix11

## SWORN STATEMENT IN PROOF OF LOSS
### (THIS FORM IS NOT A RELEASE)

POLICY NO:  913865

INSURING COMPANY NAME:

NAMED INSURED (AS SHOWN ON THE ABOVE POLICY):  PAUL J. SMITH

The statements made in this sworn statement in proof of loss are to the best of my knowledge and belief.

1) **Time and Cause of Loss:**
   a.  Date of Loss: in accident 3/2/08

   b.  Time of Loss: after 4:30  ☐am ☒pm  before 4:30 PM.

   c.  Cause of Loss: (explain) _Martana Longoria stole our property_

2) **Interest:**
   a.  The interest of the insured's in the damaged property (owner, leasehold, etc.):

   | INSURED'S NAME | INTEREST |
   |---|---|
   | (1) Paul J Smith | 100% |
   | (2) Sho Smith | |

   b.  The interest of all others in the damaged property (mortgagee, loss payee, assignee, etc.):

   | NAME | INTEREST |
   |---|---|
   | (1) 0 0% | |
   | (2) | |

3) **Other Insurance:**
   If there is other insurance which may cover this loss, provide the company name(s) and policy number(s).

   | COMPANY NAME | POLICY NO. |
   |---|---|
   | a. | |
   | b. 0 % | No other |
   | c. | |

4) Valuation of the damaged property at time of loss:

| PROPERTY DESCRIPTION | ACTUAL CASH VALUE | REPLACEMENT COST VALUE | AMOUNT CLAIMED |
|---|---|---|---|
| Dwelling | $ 150 000 | $ 250,000 | $ 150,000 |
| Other Structures | $ — | $ — | $ |
| Personal Property | $ 55360 | $ 55360 | $ 55360 |
| Other | $ | $ | $ |

includes doors & trim

| | | | |
|---|---|---|---|
| _Paul J Sm_ | 5/21/08 | | |
| Signature | Date | Signature | Date |

Subscribed and sworn to before me this ___21st___ day of ___May___, 20 08.

Signed _Jeanette Y Tones_   My commission expires _____ 2-2010

Notary Public in and for ___Harris   Texas___
County, Texas

JEANETTE Y TONES
Notary Public   208-055 (Rev. 8/98)
STATE OF TEXAS
My Comm. Exp. 11-12-10

PLAINTIFF'S
EXHIBIT
25

PENGAD 800-631-6989

115

12. Insurance Claim Red Flagged
DefExh1
RR12:64
Appendix12

FOLLOWING
VIN: n/a
License Plate:     n/a
Equipment Info
Make:       n/a    Model:      n/a   Year:       n/a
Color:      n/a    Mileage:    n/a   Hours:      n/a
Salvage Facility
Salvage Facility:       n/a    Stock No:   n/a
Phone:      n/a
Address:    n/a

COMPLETE THIS SECTION ON ALL REFERRALS
Description of Loss:    THERE WAS A THIEF OF THE INSURED PROPERT Y
VACANT HOME ON THE PROPERTY HAD THE METAL ROOF STOLEN INTERIOR WALLS,
TRIM A ND DOORS ELECTRICAL BOX WAS STOLEN SOME FURNITURE STOLEN

Suspicious?        Yes
Comments/Reason For Referral to SIU
(RED FLAGS):       This is an abandoned palntation home. The roof was
removed along with windows an doors. The home looks as if it was being perpared for
distruction. Insured stated that it was all stolen. The neighbors told the investigating
officer that they heard hammering on Saturday morning and also heard it again on Tuesday
and Wenesday during the afternoon that week prior. This indicated that the materials were
removed during a week time span and also during daylight hours.
* * * NOTE * * *

GET AUTHORIZATION FORM 904-030 SIGNED ON ALL FIRE, THEFT, OR SUSPICIOUS LOSSES.

2

62

13. Insurance Claim Paid
DefExh1
RR12:39
Appendix13

```
CLAIM #..:780622          ELN NOTEPAD DISPLAY          06/19/2008  10:51:36
CATEGORY:      TYPE: CLO  AUTHOR: UTTRS02   DEST: UTKXJ02              PAGE: 001
ADJUSTER #8399
COPY 1:            COPY 2:            COPY 3:            COPY 4:
```

CLOSING:                                                                    001
INSD. HAD PERSONAL PROPERTY STOLEN FROM A LOCATION OTHER THAN RESIDENCE.
PAID UNDER MHHG INSD. MHHG COVERAGE IS $300000.00 PAYABLE AMOUNT NOT TO
EXCEED $30000.00 TEN PERCENT EXTENTION OF COVERAGE.
AMOUNT PAID $27810.00 RCV OF DAMAGES ON ANTIQUES NO DEPRECIATION TAKEN.
ALL DOCS UPLOADED
PLEASE CLOSE
THANKS,

14. Jury Charge
CR1031
Appendix14

| | | |
|---|---|---|
| **SHAMARK SMITH LIMITED PARTNERSHIP,**<br>**Plaintiff** | ‖ | **IN THE DISTRICT COURT** |
| **VS.** | ‖ | **20ᵗʰ JUDICIAL DISTRICT** |
| **MARTIN M. LONGORIA,**<br>**Defendant.** | ‖ | **MILAM COUNTY, TEXAS** |

## CHARGE OF THE COURT

### LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments. you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else. either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations. the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.

1. Do not let bias. prejudice. or sympathy play any part in your decision.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

Page 1 of 29

**FILED**
At 2:25 o'clock P M

AUG 0 1 2014

CINDY FECHNER
DISTRICT CLERK, MILAM COUNTY, TEXAS

1031

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on the preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

   The term "preponderance of the evidence" means the greater weight of credible evidence admitted in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions may ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. That would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

1033

**Question 1**

Did Martin M. Longoria or any of his agents or employees commit a conversion of any property, materials, or items owned by Shamark Smith Limited Partnership, Sharon D. Marcus, or Paul J. Smith?

You are instructed that "**conversion**" occurs if (1) Shamark Smith Limited Partnership, Sharon D. Marcus, or Paul J. Smith beneficially owned any property, materials, or items; and (2) Martin M. Longoria or any of his agents or employees wrongfully exercised dominion or control over the property, materials, or items to the injury of Shamark Smith Limited Partnership, Sharon D. Marcus, or Paul J. Smith.

Answer "Yes" or "No":

Answer: _No_

1034

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

**Question 2**

What sum of money, if paid now in cash, would fairly and reasonably compensate Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith for the damages, if any, that were proximately caused by the conversion(s)?

Consider the elements of damages listed below and none other. Consider each element separately. Do not reduce the amount, if any, in your answers because of the wrongdoing, if any, of Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

1.      Loss of market value.

Find the market value of the property, materials, or items in question in Milam County, Texas as of the date of the conversion(s), if any.

"Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

Answer in dollars and cents for damages, if any.

Answer: _____

2.      Cost of repairs or restoration of the Old Sneed Home to its former condition.

Consider the reasonable cost in Milam County, Texas, to restore the Old Sneed Home to the condition it was immediately before the occurrence in question.

Answer in dollars and cents for damages, if any.

Answer: _____

3.      Loss of use.

"Loss of use" damages compensate Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith for their lost profits sustained in the past.

Answer in dollars and cents for damages, if any.

Answer: _____

1035

**Question 3**

Did Martin M. Longoria or any of his agents or employees trespass on the real property belonging to Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith?

> Trespass to real property is defined as an unauthorized entry upon the land of another. Every unauthorized entry is a trespass even if no damage is done. A trespass can be either by entry of a person on another's land or by causing or permitting a thing to cross the boundary of the premises.

Answer "Yes" or "No."

Answer: _____No_____

1036

If you answered "Yes" to Question 3, then answer the following question. Otherwise, do not answer the following question.

**Question 4**

What sum of money, if paid now in cash, would fairly and reasonably compensate Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith for the damages, if any, that were proximately caused by the trespass?

Consider the elements of damages listed below and none other. Consider each element separately. Do not reduce the amount, if any, in your answers because of the wrongdoing, if any, of Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

 1. Loss of market value.

Find the market value of the property, materials, or items in question in Milam County, Texas as of the date of the conversion(s), if any.

"Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

Answer in dollars and cents for damages, if any.

Answer: _____

 2. Cost of repairs or restoration of the Old Sneed Home to its former condition.

Consider the reasonable cost in Milam County, Texas, to restore the Old Sneed Home to the condition it was immediately before the occurrence in question.

Answer in dollars and cents for damages, if any.

Answer: _____

 3. Loss of use.

"Loss of use" damages compensate Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith for their lost profits sustained in the past.

Answer in dollars and cents for damages, if any.

Answer: _____

Answer the following question only if you unanimously answered "Yes" to Questions 1 or 3. Otherwise, do not answer the following question.

**Question 5**

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

Do you find by clear and convincing evidence that the harm to Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith resulted from malice?

**"Clear and convincing evidence"** means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

**"Malice"** means a specific intent by Martin M. Longoria or any of his agents or employees to cause substantial injury or harm to Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith.

Answer "Yes" or "No."

Answer: _____

1038

Answer the following question only if you unanimously answered "Yes" to Questions 1 or 3. Otherwise, do not answer the following question.

**Question 6**

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

Do you find by clear and convincing evidence that the harm to Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith resulted from gross negligence?

**"Clear and convincing evidence"** means the degree or measure of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

**"Gross negligence"** means an act or omission by Martin M. Longoria or any of his agents or employees,

      (a)     which when viewed objectively from the standpoint of Martin M. Longoria or any of his agents or employees at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of its potential harm to others; **and**

      (b)     of which Martin M. Longoria or any of his agents or employees has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Answer "Yes" or "No."

Answer: _____

1039

Answer the following question only if you unanimously answered "Yes" to Question 5 or 6. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

**Question 7**

What sum of money, if any, if paid now in cash, should be assessed against Martin M. Longoria and awarded to Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith as exemplary damages, if any, for the conduct found in response to Question 5 or 6?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

      a.      The nature of the wrong.

      b.      The character of the conduct involved.

      c.      The degree of culpability of Martin M. Longoria.

      d.      The situation and sensibilities of the parties concerned.

      e.      The extent to which such conduct offends a public sense of justice and propriety.

      f.      The net worth of Martin M. Longoria.

Answer in dollars and cents, if any.

Answer: _____

1040

**Question 8**

Answer the following question only if you unanimously answered "Yes" to Question 1. Otherwise, do not answer the following question.

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

> Did Martin M. Longoria or any of his agents or employees commit "Theft", and was the value of the stolen property $20,000.00 or greater?
>
> "Theft" means that a person unlawfully appropriates *property* with the intent to deprive the owner of property. Appropriating *property* is unlawful if it is without the owner's effective consent.
>
> A person acts with intent with respect to the nature of his conduct or to a result of his conduct when it is the conscious objective or desire to engage in the conduct or cause the result.
>
> "Deprive" means to *withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner.*
>
> "Owner" means a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than *Martin M. Longoria or any of his agents or employees.*
>
> "Property" means anything of value.
>
> "Consent" means assent in fact, whether express or implied.
>
> "Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if induced by deception or coercion.

Answer "Yes" or "No."

Answer: _____

1041

Answer the following question only if you answered "Yes" to Question 8. Otherwise, do not answer the following question.

**Question 9**

What is a reasonable fee for the necessary services of Shamark Smith Limited Partnership and Sharon D. Marcus' attorneys stated in dollars and cents?

Factors to consider in determining a reasonable fee include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

      a.     For representation in the trial court.

Answer: _____

      b.     For representation through appeal to the Court of Appeals.

Answer: _____

      c.     For representation through appeal to the Supreme Court of Texas.

Answer: _____

1042

Answer the following question only if you answered "Yes" to Question 8. Otherwise, do not answer the following question.

**Question 10**

What is a reasonable fee for the necessary services of Paul J. Smith's attorney, stated in dollars and cents?

Factors to consider in determining a reasonable fee include:

(1)    the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2)    the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)    the fee customarily charged in the locality for similar legal services;

(4)    the amount involved and the results obtained;

(5)    the time limitations imposed by the client or by the circumstances;

(6)    the nature and length of the professional relationship with the client;

(7)    the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)    whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

a.    For representation in the trial court.

Answer: _____

b.    For representation through appeal to the Court of Appeals.

Answer: _____

c.    For representation through appeal to the Supreme Court of Texas.

Answer: _____

Answer the following question only if you answered "No" to Question 8. Otherwise, do not answer the following question.

**Question 11**

What is a reasonable fee for the necessary services of Martin M. Longoria's attorneys, stated in dollars and cents?

Factors to consider in determining a reasonable fee include:

(1)     the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2)     the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)     the fee customarily charged in the locality for similar legal services;

(4)     the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the circumstances;

(6)     the nature and length of the professional relationship with the client;

(7)     the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)     whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

a.     For representation in the trial court.

Answer: _$163,000.⁰⁰_

b.     For representation through appeal to the Court of Appeals.

Answer: _$30,000.⁰⁰_

c.     For representation through appeal to the Supreme Court of Texas.

Answer: _$20,000.⁰⁰_

1044

**Question 12**

Did Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership maliciously prosecute Martin Longoria?

"Malicious prosecution" occurs when one person initiates or procures, with malice, and without probable cause at the time the prosecution is commenced, the prosecution of an innocent person.

"Malice" means ill will, bad or evil motive, or such gross indifference to the rights of others as to amount to a willful or wanton act.

"Probable cause" means the existence of such facts and circumstances as would excite belief in a person of reasonable mind, acting on the facts or circumstances within his knowledge at the time the prosecution was commenced, that the other person was guilty of a criminal offense. The probable cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: __Yes__

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: __Yes__

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: __Yes__

**Question 13**

Did Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership intentionally inflict severe emotional distress on Martin Longoria?

Intentional infliction of emotional distress occurs when the defendant acts intentionally or recklessly with extreme and outrageous conduct to cause the plaintiff emotional distress and the emotional distress suffered by the plaintiff was severe.

"Extreme and outrageous conduct" occurs only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: _____Yes_____

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: _____Yes_____

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: _____Yes_____

1046

**Question 14**

Did Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership publish the following statement: that Martin Longoria had stolen components of or contents inside the Old Sneed Home?

"Publish" means intentionally or negligently to communicate the matter to a person other than Martin Longoria who is capable of understanding its meaning and may be made orally or in writing.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: _____ Yes _____

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: _____ Yes _____

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: _____ Yes _____

If you answered "Yes" in Question 14 as to Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership, then answer the following question as to that respective party. Otherwise, do not answer the following question.

**Question 15**

Was the statement in Question 14 defamatory concerning Martin Longoria?

"Defamatory" means an ordinary person would interpret the statement in a way that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach the person's honesty, integrity, virtue, or reputation.

In deciding whether a statement is defamatory, you must construe the statement as a whole and in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: ___Yes___

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: ___Yes___

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: ___Yes___

If you answered "Yes" in Question 15 as to Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership, then answer the following question as to that respective party. Otherwise, do not answer the following question.

**Question 16**

Do you find that the statement that Martin Longoria had stolen components of or contents inside the Old Sneed Home was false at the time it was made as it related to Martin Longoria?

"False" means that a statement is not literally true or not substantially true. A statement is not "substantially true" if, in the mind of the average person, the gist of the statement is more damaging to the person affected by it than a literally true statement would have been.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: _____ **Yes** _____

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: _____ **Yes** _____

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: _____ **Yes** _____

1049

If you answered "Yes" in Question 16 as to Paul J. Smith. Sharon D. Marcus, and/or Shamark Smith Limited Partnership, then answer the following question as to that respective party. Otherwise, do not answer the following question.

**Question 17**

Did Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership know or should they have known, in the exercise of ordinary care, that the statement contained in Question 14 was false and had the potential to be defamatory?

> "Ordinary care" concerning the truth of the statement and its potential to be defamatory means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: __**Yes**__

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: __**Yes**__

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: __**Yes**__

1050

If you answered "Yes" in Question 17 as to Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership, then answer the following question as to that respective party. Otherwise, do not answer the following question.

**Question 18**
Do you find by clear and convincing evidence that, at the time Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership made the statement in Question 14:

1. Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership knew it was false as it related to Martin Longoria, or

2. Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership made the statement with a high degree of awareness that it was probably false, to an extent that Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership in fact had serious doubts as to the truth of the statement?

"Clear and convincing evidence" is that measure or degree of proof that will produce in the mind of the jury a firm belief or conviction as to the truth of the allegations sought to be established.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: **Yes**

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: **Yes**

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: **Yes**

1051

If you answered "Yes" in Question(s) 12, 13, or 18 as to Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership, then answer the following question as to that respective party. Otherwise, do not answer the following question.

**Question 19**
What sum of money, if paid now in cash, would fairly and reasonably compensate Martin Longoria for his injuries, if any, that were proximately caused by the statement in Question 14?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss.

That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately in dollars and cents for damages, if any.

a. Injury to reputation sustained in the past.

Answer as to Paul J. Smith:

Answer: $90,000.00

Answer as to Sharon D. Marcus:

Answer: $90,000.00

Answer as to Shamark Smith Limited Partnership:

Answer: $95,000.00

b. Injury to reputation that, in reasonable probability, Martin Longoria will sustain in the future.

Answer as to Paul J. Smith:

Answer: $10,000.00

Answer as to Sharon D. Marcus:

Answer: $10,000.00

Answer as to Shamark Smith Limited Partnership:

Answer: $20,000.00

c. Mental anguish sustained in the past.

Answer as to Paul J. Smith:

Answer: $20,000.00

Answer as to Sharon D. Marcus:

Answer: $20,000.00

Answer as to Shamark Smith Limited Partnership:

Answer: $35,000.00

d. Mental anguish that, in reasonable probability. Martin Longoria will sustain in the future.

Answer as to Paul J. Smith:

Answer: — O —

Answer as to Sharon D. Marcus:

Answer: —0 —

Answer as to Shamark Smith Limited Partnership:

Answer: — 0 —

Answer the following question only if you unanimously answered "Yes" to Question(s) 12, 13, or 18. Otherwise, do not answer the following question.

**Question 20**

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

Do you find by clear and convincing evidence that the harm to Martin M. Longoria resulted from malice?

> **"Clear and convincing evidence"** means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

> **"Malice"** means a specific intent by Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith or any of his agents or employees to cause substantial injury or harm to Martin M. Longoria

> Answer "Yes" or "No" as to Paul J. Smith.

> Answer: __**Yes**__

> Answer "Yes" or "No" as to Sharon D. Marcus

> Answer: __**Yes**__

> Answer "Yes" or "No" as to Shamark Smith Limited Partnership

> Answer: __**Yes**__

1054

Answer the following question only if you unanimously answered "Yes" to Question 20. Otherwise, do not answer the following question.

**Question 21**

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

Do you find by clear and convincing evidence that the harm to Martin M. Longoria resulted from fraud?

"**Clear and convincing evidence**" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"**Fraud**" occurs when:

1. A party makes a material misrepresentation, and

2. The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion; and

3. The misrepresentation is made with the intention that it should be acted on by the other party; and

4. The other party relies on the misrepresentation and thereby suffers injury.

"**Misrepresentation**" means a false statement of fact.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: __Yes__

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: __Yes__

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: __Yes__

1055

Answer the following question only if you unanimously answered "Yes" to Question 21. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

**Question 22**

What sum of money, if any, if paid now in cash, should be assessed against Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith and awarded to Martin M. Longoria as exemplary damages, if any, for the conduct found in response to Questions 20 or 21?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

      a.     The nature of the wrong.

      b.     The character of the conduct involved.

      c.     The degree of culpability of Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith.

      d.     The situation and sensibilities of the parties concerned.

      e.     The extent to which such conduct offends a public sense of justice and propriety.

      f.     The net worth of Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith.

Answer in dollars and cents, if any.

Answer as to Paul J. Smith:

Answer: $30,000.⁰⁰

Answer as to Sharon D. Marcus:

Answer: $30,000.⁰⁰

Answer as to Shamark Smith Limited Partnership:

Answer: $40,000.⁰⁰

1056

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

1. have the complete charge read aloud if it will be helpful to your deliberations;

2. preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

3. give written questions or comments to the bailiff who will then give them to the judge;

4. write down the answers that you agree on;

5. get the signatures for the verdict certificate; and

6. notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

Unless otherwise instructed, you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

If 10 jurors agree on every answer, those 10 jurors sign the verdict.

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

There are some special instructions before Questions 5, 6, 7, 8 and 22 explaining how to answer those questions. Please follow the instructions. If all 12 of you answer those questions, you will need to complete a second verdict certificate for those questions.

Do you understand these instructions? If you do not, please tell me now.

JUDGE PRESIDING

1057

# Verdict Certificate

Check one:

✓ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_Judy Shelander_
Signature of Presiding Juror

_Judy Shelander_
Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

SIGNATURE                                          NAME PRINTED

1._____          _____

2._____          _____

3._____          _____

4._____          _____

5._____          _____

6._____          _____

7._____          _____

8._____          _____

9._____          _____

10._____          _____

11._____          _____

**FILED**
At _8:15_ o'clock _P_ M
AUG 0 1 2014 *Cf*

*Cindy Fechner*
CINDY FECHNER
DISTRICT CLERK, MILAM COUNTY, TEXAS

1058

If you have answered Questions 5, 6, 7, 8 and/or 22, then you must sign this certificate also.

### ADDITIONAL CERTIFICATE

I certify that the jury was unanimous in answering Question No. 5. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

_____
Signature of Presiding Juror

_____
Printed Name of Presiding Juror

I certify that the jury was unanimous in answering Question No. 6. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

_____
Signature of Presiding Juror

_____
Printed Name of Presiding Juror

I certify that the jury was unanimous in answering Question No. 7. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

_____
Signature of Presiding Juror

_____
Printed Name of Presiding Juror

I certify that the jury was unanimous in answering Question No. 8. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

_____
Signature of Presiding Juror

_____
Printed Name of Presiding Juror

I certify that the jury was unanimous in answering Question No. 22. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

_Judy Shelander_____
Signature of Presiding Juror

_Judy Shelander_____
Printed Name of Presiding Juror

**FILED**
At _8:15_ o'clock _P_ M
AUG 01 2014

CINDY FECHNER
DISTRICT CLERK, MILAM COUNTY, TEXAS

Page 29 of 29

1059